ALLEN, Judge.
The appellant, as plaintiff in the lower court, filed an action for damages for personal injuries received when a string of box cars was “kicked” against a box car in which plaintiff was working, by employees of defendant railroad. The plaintiff was unloading corn from the box car into his employer’s truck when the accident occurred. The defendant denied negligence and the 'cause proceeded to a jury trial. At the dose of all the testimony plaintiff moved for a directed verdict and the court reserved ruling at that time. *348 The jury returned a verdict for the defendants and plaintiff renewed his motion and, in the alternative, asked for a new trial. Both motions were denied and judgment was entered for the defendants.
The plaintiff was a foreman or crew leader employed by a vegetable packing house company in Belle Glade and at the time of his injury he and his crew were engaged in loading and unloading crates of vegetables between the packing house and train box cars and trucks. His employer had instructed him to take three men over to the defendant’s train make-up yard to unload a box car filled with corn and place the corn on a motor truck.
Originally the corn is loaded on railroad box cars at the packing house railroad track and either shipped to some market or, if the box car is not completely loaded at that time, it is moved over to the railroad make-up track to be finished or to be unloaded from the railroad car and put onto trucks. It is stated that this is done because of the need of a fresh supply of empty railroad cars on the packing house tracks to facilitate moving the vegetables to the markets.
The plaintiff and his crew were unloading corn from a box car in the makeup yard into a trailer-tractor. A railroad trainman with a switch engine came in their vicinity and warned plaintiff that the railroad would switch some box cars as soon as he and his crew finished their loading of their particular truck they were then using. The railroad conductor testified that the trainmen are sent down before any cars are placed on the track as there is always somebody working around the track. So when it was necessary for the railroad to switch cars backwards and forwards they would check to see if anyone was working on the track in question as there were many occasions when there were workers in this area.
While the trainman was apparently waiting for the plaintiff and his crew to finish loading the trailer there were two other trucks which were to be loaded, another trailer and another company truck at the site.
The plaintiff contends that after the switch was made the plaintiff and his crew went back to work unloading corn from the box car into the two other trucks and while engaged in such operation the plaintiff was injured by a flying switch made by the railroad which sent empty cars crashing into the box car plaintiff was working in. The railroad contends that there was only one switch and that was the one in which plaintiff was injured.
Mr. Adams, the conductor on the switch operation, testified on cross-examination that when they first went in this area he sent a trainman, Mr. Terpenning, to go down there and shove the track to the bottom, “because we had more cars going in there * *
Mr. Adams testified that he said: “Fred, go down there and shove the track to the bottom and tell those men to stay clear, we have got more cars coming in there and not back up and get afoul of the cars.”' He further stated that Terpenning stayed so long that he decided to go down and see. He testified :
“A. I didn’t have any conversation. I just said he stayed. It is my duty to find out what they are doing. I am supposed to keep them a’working. He went down there and the engine wasn’t moving, so I started down to see what was wrong, and before I got down there, about half-way through the track, why, he coupled up the cars and shoved on down, and I turned around and come on back.
“Q. When they came back up by the shack there, did they stop and pick you up? A. Yes, sir.
“Q. Where did you all go then? A. Went to Wedgeworth to pull Wedgeworth Packing House.
“Q. How far is Mr. Wedgeworth’s place from that track? A. Well, it- *349 is a good longways. It is over on the east of the main line and a good long ways and these tracks are on the west of the main line.
“Q. In other words, you have to go on the main line— A. All the way out.
“Q. And on the other side switch over to Mrs. Wedgeworth’s, over to her packing house? A. Yes. sir.
“Q. Mr. Adams, did you go directly over to her packing house? A. Yes, sir.
“Q. And pick those cars up? A. Yes, sir.
“Q. And come directly back to number 4 track? A. Yes, sir. Well, not 4 track directly. We pulled a whole cut out there on the main line. We had to switch them; like I say, some of them went into track 3, some went up the main line, some went in track-4.
■ “Q. In other words, you had another lot to do? A. I was classifying, that is right.
“Q. Approximately how long did it take you, in doing all this, to get from Mrs. Wedgeworth’s packing house back to number 4 track when the accident occurred? A. Well, I would say around 30 minutes.”
Mr. Adams then testified after he came back on the main line from Wedgeworth before he connected any cars on No. 4 track he walked over to see if there was anybody on No. 4 as he did not want to drop them in there if there was anybody working; that he walked way out in the field where he could see all the way down No. 4; that the posts down the line had flood lights on them and that looking down he did not see any trucks up there at all. In testifying he stated:
“Q. You just came to the curve, looked down the track, didn’t see anybody, so you went back, did you? A. Sir?
“Q. So you went back to the train ? A. Yes, sir, I went back and told him everything was clear.”
Mr. Adams subsequently stated that at the time he looked down track No. 4 that he was not over 25 or 30 cars from the place in question.
Mr. Terpenning, a member of the railroad crew, testified:
“A. Well, I was told to go down and shove the track the limit by Mr. Adams, the conductor. When I got down there with the engine, there were some men working in the car, so I stopped the engine and went around and told them they would have to get out. I noticed the track, the truck rather, was almost loaded so I asked them how many more they had and they said, ‘Just a few.’ And they told me — I don’t know exactly how many it was, so I told them if they would hurry up, I would let them finish.
******
“A. I waited until they finished the truck and when the doors were shut and the truck pulled away, then I tied on to the cars and shoved them about a car length of the butting block.
“Q. Then what did you do? A. I went to the engine again, and cut it off and rode on out of the track.
“Q. I want you to tell this Jury whether or not you ever went back down to that area again that night. A. I did not, not until after the accident, at least, when we switched the track later, early in the morning.
“Q. I want you to tell the Jury whether or not you ever advised those people that they could go back to work ? A. I did not.”
Again on cross-examination, Mr. Terpen-ning testified:
“Q. When you pulled out, were there any trucks left there? A. I couldn’t say for sure.
*350 “Q. You don’t recall? A. I wouldn’t know.
“Q. Were you with the train the entire time it was gone? A. Gone, where do you mean?
“Q. After it left there? A. When I left there, I rode the footboard out, and then we went to Wedgeworth and pulled Wedgeworth.
“Q. At the time you all were there, did you cut any cars out of that line of cars? A. No, sir.
“Q. I believe you said you went to Wedgeworth? A. Went to Wedge-worth and pulled Wedgeworth Packing House.
“Q. Approximately how long were you gone? A. Well, it takes time for, my job is to walk down the track, see all the gang boards are out and get the men out of them, electric light cords and whatever, a 16-car track, I had to walk to the bottom of it. It would take a good thirty minutes to pull the track and get back up on the main line.”
Terpenning also stated that a car would be about 40 feet in length. He again testified :
“Q. Before the cars were kicked, did you check the area in there ? A. I had no occasion to. Mr. Adams was there and he checked it and told me it was clear, to go ahead and do the work.
“Q. And so you personally didn’t check it? A. No, sir.”
The parties are not reconciled as to how many switches were made. Plaintiff contends that two switches were made and warning was only given for the first. Defendant, however, contends that the entire sequence of box car movements was all part of one switching movement and that the warning given was meant to cover the entire switching operation. Defendant’s conductor,- on cross-examination, stated that about 30 minutes elapsed between the two car movements that took place in plaintiff’s yrork area. He also stated that immediately subsequent to the first car movement in plaintiff’s work area, he and his crew went to another section of the yard (Wedge-worth Packing House) to pull the track. Following this, the injury-causing “flying switch” was made. Apparently it was the Wedgeworth track pulling activity that consumed the 30 minutes that elapsed between the two car movements in plaintiff’s work area. Some of the cars “pulled” from Wedgeworth’s were “kicked” into plaintiff’s work area (Track No. 4).
Prior to the “first switch,” defendant’s conductor sent his trainman on an engine into plaintiff’s work area to shove the cars to the end of the track. The trainman (witness Terpenning) rode into the work area and warned plaintiff of the upcoming switch. This is not disputed. After allowing sufficient time for plaintiff to finish loading one truck, the trainman apparently then accomplished his track shoving operation and brought the engine back, picked up the conductor (witness Adams) and proceeded to Wedgeworth.
At this point an inference-fact question arises. This is, whether it would be reasonable to expect plaintiff and his crew to go back to work after this initial switching (or more accurately — shoving) movement took place and the switch engine and crew departed.
So apparently from the evidence, after the railroad had first warned the plaintiff and his crew that they were going to switch cars, they waited for the plaintiff and his crew to finish loading the truck they were then working on and then moved some cars, after which they went to the main line then to the Wedgeworth Packing House and switched cars back and forth for some 30 minutes before they returned to the switching operations on track No. 4. It was at this time that the conductor looked down the track some thousand feet away in the nighttime and did not see trucks at the place in question where the plaintiff and *351 his crew had resumed working and told the train crew that there was nobody down there when, in fact, there were trucks out there and the parties were working. The question reverts to whether the inspection made by the defendant’s employees was sufficient to absolve them from negligence in proceeding to operate a flying switch.
Practice of making flying switches or of kicking detached railroad cars without adequate means of control or without warning that persons may be on a track has been decided in a large number of jurisdictions in this nation to be very dangerous. See Florida Cent. & P. R. Co. v. Foxworth, 41 Fla. 1, 25 So. 338; Louisville & N. R. Co. v. Williams, 183 Ala. 138, 62 So. 679; Bryan v. Southern Pacific Co., 79 Ariz. 253, 286 P.2d 761, 50 A.L.R.2d 1; Mann v. Kentucky & Indiana Terminal R. Co., Ky., 290 S.W.2d 820; and Wagoner v. North Carolina R. Co., 238 N.C. 162, 77 S.E.2d 701.
In 27 Fla.Jur. Railroads, § 157, p. 449, the general rule is stated:
“In operating its trains in the streets of towns and villages and in the immediate vicinity of public crossings, a railroad company is bound to keep a lookout when making flying switches or backing cars by the ‘kicking-back process.’ And where it is apparent, or should be apparent by the exercise of reasonable diligence commensurate with the surroundings, that a person who is on its track or is about to get on the track is unaware of his danger or cannot get out of the way, it becomes the duty of the company to use such precautions by warnings, application of brakes, or otherwise, as may be reasonably necessary to avoid injury. This duty is not fulfilled by merely ringing the engine bell. However, shifting cars by means of the ‘kicking-back process’ is not negligence per se, even though there may be a safer method of shifting them.”
Coupled with other circumstances, “kicking back” cars across the entrance of a roadway into a railroad yard without signals or warning, and without a brakeman on the rear of the cars, and without a brakeman or engine in control of them, may constitute negligence, when they are propelled backward at great speed. Morris v. Florida C. & P. R. Co., 1901, 43 Fla. 10, 29 So. 541.
The Supreme Court of Florida in Florida Cent. & P. R. Co. v. Foxworth, 41 Fla. 1, 25 So. 338, 346, in its opinion, said:
“There was no error in giving the eleventh instruction requested by plaintiff. In the preceding paragraph we have considered all objections suggested by appellant, except the one which claims that defendant’s duty under the circumstances of this case would have been completely performed by ringing the bell in the manner indicated by this instruction. The courts have frequently condemned the dangerous practice of 'kicking cars,’ or making flying switches, in populous localities, and near crossings, and have almost uniformly held that the increased hazard of these practices over the ordinary manner of railway operation imposes upon the company a duty to station a lookout upon the rear of the cars, the equivalent of which is not accomplished by ringing the engine bell. 2 Wood, R.R. § 323, p. 1517; 3 Lawson Rights, Rem. & Prac. § 1187; 2 Shear. & R.Neg. § 471; Beach, Contrib.Neg. § 194. This precaution is much more effective than the simple ringing of a bell, and if persons are injured on or near crossings, or other places much frequented by persons, where, by the exercise of this precaution, the injury could have been avoided, the company will be liable. If it be true, as contended by plaintiff, that the deceased, when injured, was crossing defendant’s track, oblivious of the approach of a train, holding an open umbrella in such a *352 manner as to obstruct his view of an approaching train, and a lookout stationed upon the rear of the car, in the exercise of reasonable diligence, could and would have discovered the plaintiff’s perilous situation in time to avert the collision by warnings, application of brakes, or otherwise, then the failure to put a lookout on the rear of such train was negligence on defendant’s part, contributing directly to the injury, and the plaintiff would be entitled to recover; the jury diminishing the damages in proportion to the. default attributable to the deceased. [Florida Cent. & P.] Railroad Co. v. Williams, 37 Fla. 406, 20 South. 558.”
In the case of Bryan v. Southern Pacific Co., 79 Ariz. 253, 286 P.2d 761, 763, 50 A.L.R.2d 1, the Arizona Supreme Court held that it was error to refuse to instruct the jury as to wanton negligence and its operation to obviate the effect of contributory negligence, since the flying switch operation could constitute wanton negligence if adequate means were not employed to protect the traveling public. The court, in its opinion, said:
“Practically since the advent of railroading the making of flying switches in populous areas without proper precautionary measures has been considered to be gross negligence. Brown v. New York Central R. Co., 1865, 32 N.Y. 597; Illinois Central R. Co. v. Baches, 1870, 55 Ill. 379. Similar language to that in the leading case of Johnson v. Seaboard Air Line Ry. Co., 163 N.C. 431, 79 S.E. 690, 696, Ann.Cas.l915B, 598, has frequently been used:
“ * * This court has recently declared, in Vaden v. North Carolina R. Co., 150 N.C. 700, 64 S.E. 762, that: “Making ‘flying switches’ on the railway tracks and sidings running across and along the streets of populous towns is per se gross negligence, and has been so declared by all courts in this country and by text-writers generally. It is stated in one of the best known text-books that the use of a running switch in a highway in the midst of a populous town or village is, of itself, ‘an act of gross and criminal negligence on the part of the company’ ” — citing Shearman and Redf Neg (3d Ed.) § 466; (citing cases) * * * > »
We cite the foregoing authorities to show the judicial opinion as to the dangerous operating effect of the so-called flying switch, especially without a brakeman, a light or other precautionary protection on the cars. We do not conclude that all of the above authorities are directly in point under the facts in the instant case; as a general proposition it is more dangerous to make a flying switch across travelled highways than it would be normally in a freight switching yard, but we conclude that where flying switch activities are indulged in in a switching yard, it places a duty on the railroad to make a strong showing of due care under a situation presented by the evidence in this case. It is apparent that the trial judge had grave doubts that the defendant in this case made such a showing even though he refused to direct a verdict in favor of the plaintiff on the question of negligence.
At the conclusion of all the evidence the plaintiff moved for a directed verdict as to negligence of the railroad. During the argument the lower court made the following comments:
“The Court: How could this thing have happened under Mr. Adams testimony? He says he looked down there and gave them the all-clear sign. How could this conceivably have happened? Did these men jump in there with their truck suddenly between the time he looked?
“Mr. Beckham: He said there were no lights. I don’t know what you can see.
*353 “The Court: Is that reasonable inspection, knowing these men were down there working?
“Mr. Beckham: They don’t know it. What right do we have to assume they were there, when Mr. Terpenning says, T went down there; I waited for them to get through; they closed the door; the truck pulled away and I told them we were going to do switching.’ And they didn’t switch them. All they did was move the ■cars. There hadn’t been any switching into those cars until this switch was made.
“The Court: That is accepting the testimony of these gentlemen.
“Mr. Beckham: That is right, which your Honor has to do on a motion for directed verdict.
“The Court: It occurs to me plaintiff has made a mighty strong case ■of negligence here. I just for the life of me can’t see how this accident could have occurred. I don’t see how you can go around there pushing those loose cars, kicking those loose cars in there under these circumstances. Your own Adams testified he knows people are always working around those cars.
“Mr. Beckman: They testified they know cars are being kicked in there all the time. Who was it that had the pick-up truck? Who came and told them? Was it their own boss, trying to get them to work, when they had been placed on notice the railroad was •coming in there. There isn’t any testimony any railroad man came in a pick-up truck and the testimony of their own witnesses is that the word to go back to work came from a man in a pick-up truck.
“The Court: I am not sure you have the right to kick these cars that distance on your own property, knowing your invitees—
“Mr. Beckham: Then you have a directed verdict, if that is the way you feel.
“The Court: I am not going to direct it. I am going to reserve ruling on it. I am pointing these things out. It occurs plaintiff has a strong case in connection with this thing. I am going to reserve ruling on the motion, but I wanted to point these things out to you. You present problems. We want to discuss both sides of this thing. All right, gentlemen, I will reserve ruling on the motion for directed verdict. Now let’s pull out the Jury instructions here.”
The jury subsequently rendered a verdict in favor of the defendant. Plaintiff made motions to have judgment entered in accordance with his motion for a directed verdict or, in the alternative, to grant a new trial. Each of these motions were denied and final judgment was entered in favor of the defendants.
It is reasonable to assume that the trial judge was of the opinion that he should direct a verdict for the plaintiff as to negligence and it is significant that counsel for the defendant railroad commented that if the judge felt that way he should direct a verdict.
We cannot determine what was in the mind of the trial judge as he made the comments above, but often, in the trial of a litigated case, the trial judge has some doubts that there is such a lack of evidence as to justify granting a directed verdict and determines to let the jury decide the issues, being of the opinion that the evidence is so overwhelming that the verdict is certain to go in favor of the party in which he is inclined to think a verdict should properly be directed, yet the jury may have become confused on the issues and brought a verdict in favor of a party who had adduced very little substantial evidence in its favor. As the Supreme Court of this state has, in several *354 cases, stated, that where the trial judge felt that substantial justice was not accomplished by the jury’s verdict, he should grant a new trial.
Certainly the record in this case shows that the trial judge was strongly of the opinion that the railroad had failed to show due care in its operation and, as the judge expressed it, “it was inconceivable for the injury to have happened according to the testimony of the conductor on the- defendant’s engine.” We must also keep in mind that this is a case where the comparative negligence rule comes in play. Contributory negligence does not bar the plaintiff from a verdict but may reduce the amount of recovery.
In the case of Turner v. Frey, Fla.1955, 81 So.2d 721, 722, where the trial judge had denied a motion for directed verdict and for a new trial although the judge had a view that the verdict was not in accord with the manifest weight and probative force of the evidence, the Supreme Court reversed and remanded for new trial. The Court, in its opinion, said:
“Since the trial judge found, and we agree, that ‘There was certainly evidence in this case upon which the jury could find the verdict which they did find,’ it was not error to refuse to direct a verdict in defendant’s favor under the rule stated in Talley v. McCain, 128 Fla. 418, 174 So. 841, 842, that ‘The court should never direct a verdict for one party unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law.’ But, as pointed out in the Talley case, supra, ‘ * * * although a motion for a directed verdict for one party may be denied, yet in the same case if the trial court is of the opinion that the verdict does not accord with the manifest weight of the evidence and the substantial justice of the cause, a new trial should be granted.’ We think the situation here is similar to that with which we were concerned in Seaboard Air Line Railway v. Anderson, 73 Fla. 1, 73 So. 837, 838, where the trial judge denied a motion for new trial, .although opining in his order that ‘ “It seems to the court that it is most improbable from the evidence, that the fire was caused by the defendant.” ’ In reversing the order denying the motion for a new trial, this court said:
“ ‘If the court considered the liability of the defendant “most improbable from the evidence,” then he obviously had “difficulty in reconciling the verdict with the justice of the case and the manifest weight of the evidence.” This being so, the defendant had a right to the benefit of such judicial opinion of the trial court, making it the duty of the court to grant a new trial, * * * The judgment is reversed, and a new trial granted.’
“We think that there can be no doubt that the trial judge in the instant case had the view that the verdict was not in accord with the manifest weight and probative force of the evidence. In these circumstances, it was his duty to grant the defendant’s motion for a new trial. Talley v. McCain, supra. See also Tampa Water Works Co. v. Mugge, 60 Fla.263, 53 So. 943, cited in Richbourg v. Hilton, Fla.1952, 56 So.2d 539.”
We are of the opinion that the lower court should have granted a new trial. Accordingly, this case is remanded for a new trial.
Reversed.
SHANNON, C. J., and FUS SELL, CARROLL W., Associate Judge, concur.