NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

JEFFREY M. EDWARDS, as Personal )
Representative of the Estate of MARY )
EDWARDS, deceased, for and on )
behalf of lawful survivors/claimants; )
JEFFREY M. EDWARDS, surviving )
spouse; JEFFREY M. EDWARDS, JR., )
surviving minor child; CARL A. )
EDWARDS, surviving minor child; and )
MATTHEW T. EDWARDS, surviving )
minor child, )
    )
            Appellants,    )
    )
v.    )    Case No. 2D14-3093
    )
JEFFREY ROSEN, M.D.; FLORIDA )
HEART ASSOCIATES, P.L.; SHAHEEN )
FARUQUE, M.D.; INPATIENT )
CONSULTANTS OF FLORIDA, INC.; )
IMTIAZ AHMAD, M.D.; ALLERGY, )
SLEEP AND LUNG CARE, P.A.; and )
LEE MEMORIAL HEALTH SYSTEM, )
    )
            Appellees.    )
_____)

Opinion filed January 29, 2016.

Appeal from the Circuit Court for Lee
County; Keith R. Kyle, Judge.

Harvey J. Sepler, Hollywood, for
Appellants.

Mark Hicks, Cindy Ebenfeld, and Jedidiah
Vander Klok of Hicks, Porter, Ebenfeld &

Stein, P.A., Miami; and Ronald H.
Josepher, Tyler Batteese, and Brendan W.
Rowe of Josepher & Batteese, P.A.,
Tampa, for Appellees Jeffrey Rosen, M.D.
and Florida Heart Associates, P.L.

No appearance for remaining Appellees.


KHOUZAM, Judge.

Jeffrey Edwards and his children (collectively Edwards) appeal the final judgment entered in favor of Dr. Jeffrey Rosen following a jury trial. Because the trial court should have granted Edwards' motion for a new trial, we reverse.

## I. Background

Jeffrey Edwards' wife, Mrs. Mary Edwards, was hospitalized for a pulmonary embolism and placed under the care of a team of physicians lead by Dr. Shaheen Faruque. The team included Dr. Rosen, Dr. Jeffrey Scott, Dr. Richard Juda, and Dr. Imtiaz Ahmad. Mrs. Edwards eventually died while she was under the care of these physicians. Edwards filed suit against Dr. Faruque, Dr. Ahmad, Dr. Rosen, their employers, and Lee Memorial Health Systems, which in turn employed Dr. Scott and Dr. Juda.[1] In his original answer, Dr. Rosen raised a conditional Fabre[2] defense, alleging: "[I]f any Co-Defendants are dismissed from this case at any time, these Defendants adopt at the time of dismissal all allegations asserted by Plaintiff against those Co-

---

[1]Dr. Scott and Dr. Juda were immune from personal liability since they were employed by Lee Memorial Health Systems. See § 768.28(9)(a), Fla. Stat. (2007).

[2]Fabre v. Marin, 623 So. 2d 1182 (Fla. 1993), receded from on other grounds by Wells v. Tallahassee Mem'l Reg'l Med. Ctr., Inc., 659 So. 2d 249, 254 (Fla. 1995).

Defendants, for purposes of placing those individuals and/or entities on the verdict form pursuant to Fabre."  Dr. Ahmad and his employer were granted summary judgment. Edwards reached a settlement with Dr. Faruque, his employer, and Lee Memorial Health Systems, leaving only Dr. Rosen as a defendant.  The court initially allowed Dr. Rosen to raise a Fabre defense with respect to Lee Memorial Health Systems for the alleged negligence of Dr. Scott and Dr. Juda.  However, Edwards filed a motion arguing that Lee Memorial could not be put on the verdict form pursuant to Fabre because Lee Memorial would only be vicariously liable for the negligence of Dr. Scott and Dr. Juda. See Nash v. Wells Fargo Guard Servs., Inc., 678 So. 2d 1262, 1264 (Fla. 1996) (holding that a "named defendant cannot rely on the vicarious liability of a nonparty to establish the nonparty's fault").  The court granted the motion and struck Lee Memorial as a Fabre defendant.

In response to the striking of Lee Memorial Hospital as a Fabre defendant, Dr. Rosen moved ore tenus to amend his Fabre defense to specifically include Dr. Juda and Dr. Scott as non-party defendants.  Edwards objected, arguing that due to the trial's proximity, he would be prejudiced because his trial preparations had not accounted for the inclusion of these two doctors.  The court granted the motion in light of its reconsideration of the motion to strike Lee Memorial and the fact that discovery had been taken with respect to these two doctors.  Trial commenced twelve days later.

The case proceeded to trial with Dr. Rosen as the named defendant and with Doctors Scott, Juda, and Faruque as Fabre defendants as pleaded by Dr. Rosen. During preliminary instructions, the court instructed the jury as follows:

> If I later decide different or additional law applies to this
> case, I will tell you.  In any event, at the end of the evidence,

> I will give you the final instructions on which you must base your verdict. At that time, you will each be given a complete written set of the instructions that I am reading to you, so you do not have to memorize what I'm about to tell you.

At trial, Edwards curated his case around the fact that all of these doctors would be on the verdict form for the purposes of apportioning liability under Fabre. During opening arguments, Edwards' counsel informed the jury that Dr. Rosen would be alleging as an affirmative defense that the other doctors were negligent:

> [Dr. Rosen] pled as an affirmative defense that it was Dr. Juda and Dr. Scott and Dr. Faruque that were negligent in this case, that he was not negligent, but these physicians were negligent in treating [Mrs. Edwards]. And if they are negligent as part of the team, Dr. Rosen is just as negligent.

During his case-in-chief Edwards presented evidence that all of the treating physicians were negligent in their treatment of Mrs. Edwards in reliance on the fact that Dr. Rosen had pleaded the affirmative defense that the other doctors were negligent. Edwards finished his presentation of evidence on February 5, 2014. Dr. Scott began reading back his first deposition on the same day. After the jury left the courtroom, the court and the attorneys discussed how the rest of the trial would proceed. Before adjourning for the evening, the court asked: "Anything else folks?" Dr. Rosen did not state that he had another matter to resolve.

> The next morning, on the final day of trial, the proceedings began as
follows:

> THE COURT: Good morning everyone. We need to go ahead and go on record for the Edwards case, 10-CA-2482. We have everyone present and accounted for. We are waiting for the jury. Go ahead sir.

> [DR. ROSEN'S COUNSEL]: Yes, Your Honor. At this time the defense is withdrawn. It's a [Fabre] defense.

- 4 -

THE COURT: As to all three?

[DR. ROSEN'S COUNSEL]: As to all. Yes, Your Honor.

Edwards immediately objected and moved for a mistrial, claiming that withdrawing the defense was prejudicial and premeditated. Edwards argued that he had tailored his case to account for Dr. Rosen's Fabre defense:

> And we put that on, Your Honor, because there was a defense. They hemmed and hawed and fought like hell to amend their affirmative defenses in this case, Your Honor, at the [thirteenth] hour and you allowed it in, Your Honor. You granted their motion, their ore tenus motion to amend to allow a claim against Dr. Faruque, against Dr. Ahmad, and against Dr. Scott. This is how we just—this is what they do. This is how they do it, and I think it's extremely prejudicial. I would never have put that testimony, Your Honor. I would have just concentrated on Dr. Rosen and he would have been the only one on the verdict form.

The court was also troubled by the tactic employed by Dr. Rosen but felt constrained to allow it:

> I'm frankly troubled and I share your concern . . . insofar as this side you all fought like tooth and nail to get those defenses in, now about three to four weeks ago at most, and here we are dropping them. But the case, well insofar as I'm aware, does allow for a permitted defendant at anytime to drop defenses just as a plaintiff can drop a claim.

Edwards also moved for a curative instruction to inform the jury that Dr. Rosen had withdrawn the affirmative defense. However, the trial court did not rule on the motion. Rather, it delayed ruling on the matter until the final jury instructions were discussed and added the following instruction to account for the change: "As I previously instructed I advised you that if I decide a different or additional law applies after presentation of the case, I would tell you. Please note these instructions are different and these revised instructions are the ones that you must follow in reaching your verdict." After the six-

day trial, the jury was then provided a verdict form asking them to decide whether there was any negligence on the part of Dr. Rosen that was the legal cause of Mrs. Edwards' death. The form asked the jury to check either "yes" or "no."

During closing arguments, Dr. Rosen's attorney further highlighted the issue, arguing:

> Keep in mind that you should all realize this. Only defendants in the case were Dr. Rosen and his partner. There are no other defendants in this case, and although the defense is not—didn't present any other testimony, any witnesses to say that the treatment by the others was negligent, it's not part of the case. If you all have any kind of disagreement with the other treatment, that's not for this case because Dr. Rosen is the only defendant and so he is automatically responsible for that. So it's a case against Dr. Rosen.

The jury returned a verdict in favor of Dr. Rosen. Edwards filed a motion for a new trial followed by an amended motion.

At the hearing on Edwards' motions and in the motions themselves, Edwards argued that the cumulative events of the expansion of the Fabre defense prior to trial, Dr. Rosen's last minute withdrawal of the defense, and the trial court's refusal to give a curative instruction collectively prejudiced him and warranted a new trial. He insisted that the existence of the Fabre defense shaped the presentation of his case— that he would have presented his case differently if Dr. Rosen was not going to place the Fabre defendants on the verdict form. The trial court asked Edwards' counsel the following:

> THE COURT: Did anyone ever move to amend the pleadings?
>
> MS. LEVINE: No, I did not move to amend the pleadings, your Honor.

- 6 -

THE COURT: Okay.

MS. LEVINE: I don't think that I could have moved to amend the pleadings, because I had settled out with these Fabre defendants. I couldn't have amended my pleadings at that time, your Honor.

THE COURT: Okay.

MS. LEVINE: So—and I know you're referring to the— to the Hartong decision, but I think it's totally—you could definitely distinguish that.

THE COURT: Because, to be—

MS. LEVINE: I couldn't—

THE COURT: —to be frank, that's what I was waiting for you to do. And I couldn't say, do that, obviously, just as I can't help the other side out either, but

MS. LEVINE: I understand.

THE COURT: since we are past that point, rhetorically, that's why I'm asking the question—

MS. LEVINE: Right.

THE COURT: because I was anticipating that being your next request, and it—

MS. LEVINE: Well, it—

THE COURT: -- hadn't been made.

MS. LEVINE: -- really caught me totally off guard.

THE COURT: And I know it did.

Dr. Rosen argued and the trial court agreed that Edwards should have moved to amend the pleadings to add the Fabre defendants back onto the verdict form. However, the trial court expressed concern over the situation:

It—it troubled me for both sides. And to use Ms. Levine's words, she was rather shellshocked, and she, to use her words, had egg on her face from her perspective. And I, frankly, and in all due candor, was shocked that it was withdrawn as well. I mean, it—it put me in a bit of a pickle, too, insofar as I—I felt in kind of a quandary, too. And I don't take sides in any given case. It's immaterial to me who . . . . wins or loses. It doesn't matter to me, other than I want a fair trial in any given case that I do.

The court denied the motions, stating:

Having reviewed the materials provided, as well as again my own notes, the case law provided to me, as well as that as I encountered on my own, I don't believe, respectfully, there's a basis upon which I can set aside the jury's verdict, nor are there grounds to grant either the original or amended version of the request for a new trial.

So, respectfully, I will deny that.

## II. Analysis

The trial court abused its discretion in denying Edwards' motion for a new trial.[3] Trial courts have "broad discretion in considering a motion for new trial." Nor-Tech Powerboats, Inc. v. H.P.B.C., Inc., 855 So. 2d 103, 105 (Fla. 2d DCA 2003). A new trial should be granted "where the trial judge felt that substantial justice was not accomplished by the jury's verdict." Bowe v. Butler, 133 So. 2d 347, 354 (Fla. 2d DCA 1961). It is true that "[m]ere disagreement with the verdict of a jury is not sufficient warrant for a new trial." Lopez v. Cohen, 406 So. 2d 1253, 1256 (Fla. 4th DCA 1981). But "Florida Rule of Civil Procedure 1.530(a) enables a trial court to evaluate matters

---

[3]The dissent argues "the trial judge could have rejected as unpersuasive Edwards' claim that the addition to the case of Dr. Scott and Juda as Fabre defendants on the eve of trial and the subsequent withdrawal of the Fabre defense put him at an unfair disadvantage in the presentation of his case." We emphasize that the trial court was operating under the misunderstanding that Edwards could have amended his pleadings to put Fabre defendants back on the verdict form. Cf. Applegate v. Barnett Bank of Tallahassee, 377 So. 2d 1150, 1152 (Fla. 1979) ("[A] misconception by the trial judge of a controlling principle of law can constitute grounds for reversal.").

- 8 -

that it did not consider prior to judgment, and to correct any error if the trial court becomes convinced that it has erred." Byrne v. Byrne, 128 So. 3d 2, 7 (Fla. 3d DCA 2012).

"The showing necessary to overturn the denial of a motion for new trial is not as great as that necessary to overturn an order granting such a motion." Manhardt v. Tamton, 832 So. 2d 129, 131 (Fla. 2d DCA 2002). A trial court should grant a motion for new trial when "the jury has been deceived as to the force and credibility of the evidence or has been influenced by considerations outside the record." Id. (quoting Brown v. Estate of Stuckey, 749 So. 2d 490, 497 (Fla. 1999)). "Under those circumstances, '[t]he trial judge's discretion permits the grant of a new trial although it is not clear, obvious, and indisputable that the jury was wrong.' " Id. (quoting Brown, 749 So. 2d at 497). In reviewing an order on a motion for a new trial, an appellate court should consider the totality of all errors and improprieties. Id. at 132-33.

Considering the totality of the errors and improprieties in this case, we hold that a new trial is warranted. The specific sequence of events that transpired—the belated amendment of the Fabre defense, the last minute withdrawal of the defense, and the trial court's failure to give a curative instruction to the jury—generated prejudice that Edwards' counsel could not cure. This sequence of events culminated in a situation in which the plaintiffs presented their case premised on the fact that the jury would apportion fault between Dr. Rosen and the Fabre defendants, only to have the jury instead decide the case on an all-or-nothing basis.[4]

---

[4]Although the actual juror question is not in the record before this court, Edwards' motion for a new trial notes that a juror asked "who's being sued here," indicating that the jury may have been confused.

Courts have addressed a tactic similar to the one employed by Dr. Rosen in the context of contributory negligence.  In those cases, defendants raised the affirmative defense of comparative negligence only to withdraw it after some evidence of the plaintiff's negligence was admitted.  In <u>Hartong v. Bernhart</u>, 128 So. 3d 858, 860 (Fla. 5th DCA 2013), the plaintiff filed a complaint alleging that the defendants' negligence caused the wrongful death of his twenty-one-year-old daughter.  The plaintiff did not plead comparative negligence.  Rather, the defendants raised the daughter's negligence as an affirmative defense.  The defendants asserted in opening statements that the presence of alcohol and hydrocodone in the daughter's system caused complications and, at least partially, caused her death.  <u>Id.</u>  The defendants then put on evidence to support these allegations, but withdrew their affirmative defense after resting.  <u>Id.</u>  The plaintiff then moved under Florida Rules of Civil Procedure 1.190(b) and (e) to amend the complaint to conform to the evidence presented at trial to obtain a jury instruction on comparative negligence, but the trial court denied the request.  <u>Id.</u> The Fifth District held that trial court abused its discretion in doing so.  <u>Id.</u> at 861-62. The court noted that this tactic "created a 'take it or leave it' situation similar to contributory negligence, which is contrary to Florida law and public policy."  <u>Id.</u> at 861. The court reasoned that after the defendants had waived comparative negligence, the plaintiff was not entitled to a corresponding jury instruction.  <u>Id.</u> at 862.  Therefore, the plaintiff's only option to obtain the jury instruction was to amend the complaint.  <u>Id.</u>

Similarly, in <u>Philip Morris USA, Inc. v. Arnitz</u>, 933 So. 2d 693 (Fla. 2d DCA 2006), the plaintiff filed a complaint alleging strict liability for defects in the defendant's cigarette design.  In his complaint, the plaintiff admitted that he shared comparative fault

with the defendant cigarette manufacturer and sought an apportionment of damages. Id. at 695. The defendant filed a notice that it was withdrawing its affirmative defense of comparative fault and later filed a motion to strike the plaintiff's reference to comparative fault in the pleadings. Id. The trial court denied the motion, and the defendant appealed arguing that a plaintiff cannot inject comparative fault because it is strictly an affirmative defense that only a defendant may raise. Id. at 696-97. This court affirmed the trial court's ruling, reasoning that "[t]he fact that comparative negligence may be raised as an affirmative defense does not mean that a defendant can determine how a plaintiff shapes his theory of the case." Id. at 697. This court further opined that "a defendant should not be able to control the plaintiff's theory of his case and preclude the plaintiff from accepting some responsibility for his injuries." Id. at 698.

What distinguishes this case from Hartong and Arntiz is that amending the complaint to add the Fabre defendants back on the verdict from was not an option available to Edwards. While Dr. Rosen contends that Edwards could have amended the pleadings to keep the Fabre defendants on the verdict form, he has failed to provide, and we have been unable to locate, any authority standing for the proposition that a plaintiff can amend their complaint to add nonparty defendants to a verdict form after they have been settled with or otherwise dismissed from the case. We note that the trial court was also operating under the erroneous assumption that Edwards would have been able to amend the pleadings. See Van v. Schmidt, 122 So. 3d 243, 258 (Fla. 2013) ("[A] trial court's conclusions of law in an order granting a new trial are not entitled to deference because the trial court's superior vantage point is not implicated.").

- 11 -

Plaintiffs are permitted to concede their own comparative fault and obtain the relative instruction even when the defendant does not raise the issue as an affirmative defense. Arnitz, 933 So. 2d at 698; Hartong, 128 So. 3d at 861. In contrast, in order to include a nonparty on the verdict form under Fabre, a defendant must plead the negligence of the nonparty as an affirmative defense and specifically identify the nonparty. See Nash v. Wells Fargo Guard Services, Inc., 678 So. 2d 1262, 1264 (Fla. 1996). This notice is required prior to trial because the Fabre defense "may affect both the presentation of the case and the trial court's ruling on evidentiary issues." Id.

We recognize that a defendant may waive any defense. See Bryant v. Fiadini, 405 So. 2d 1341, 1343 (Fla. 3d DCA 1981). However, such a right is not carte blanche to engage in gamesmanship or abuse procedure. From our review of the record, it is apparent that Dr. Rosen's trial counsel engaged in conduct designed to acquire the benefit of the Fabre defense, i.e., having evidence of the negligence of others introduced at trial, without the cost of having fault apportioned between the Fabre defendants and himself. This gamesmanship was an attempt by Dr. Rosen's counsel to exert control over Edwards' presentation of the case. Cf. Arnitz, 933 So. 2d at 698 ("[I]f a plaintiff chooses to plead his own comparative fault, a defendant should not be able to control the plaintiff's theory of his case and preclude the plaintiff from accepting some responsibility for his injuries."). More importantly, raising an affirmative defense only to withdraw it in an attempt to muddle the plaintiff's presentation of the case undermines the truth-seeking purpose of a trial.

We do not hold that defendants may not waive or withdraw a defense, but we caution that engaging in the procedural maneuvering utilized by Dr. Rosen's trial

counsel risks a new trial.  For the foregoing reasons, we reverse the final judgment and

remand for a new trial.

Reversed and remanded for a new trial.

CASANUEVA, J., Concurs.
WALLACE, J., Dissents with opinion.

WALLACE, Judge, dissenting.

I respectfully dissent.  Speaking generally, it is apparent that procedural

maneuvering of the sort pursued by the defense in this case—the addition of one or

more Fabre defendants on the eve of trial and the withdrawal of the Fabre defense just

before the submission of the case to the jury—could be calculated to sow confusion

among jurors and to unfairly disadvantage a plaintiff in the presentation of his or her

case.[5]  However, a review of the record in this case convinces me that the trial judge

could have reasonably concluded that Edwards was not placed at an unfair

disadvantage in the presentation of his case as a result of the "gamesmanship"

criticized by the majority.  An explanation of this point requires a brief statement of the

---

[5]Cf. D'Angelo v. Fitzmaurice, 863 So. 2d 311, 312 n.2 (Fla. 2003) (noting that the defendant's withdrawal of a Fabre defense "was a strategic decision").  To the extent that defendants are employing machinations of this sort in the Florida courts to abuse the jury trial process, it might be appropriate to adopt an amendment to the civil rules that would prohibit a defendant from withdrawing a Fabre defense without the consent of all parties once a jury is sworn to try the case.  Absent such a procedural innovation, the trial courts of this state are best equipped to address any such problem through the entry of detailed pretrial orders and the strict enforcement of them thereafter.

pertinent facts and the theory underlying Edwards' claim against Dr. Rosen for alleged medical malpractice.

Mrs. Edwards was hospitalized for a pulmonary embolism. During her hospitalization, Dr. Faruque, a hospitalist, was the primary manager of Mrs. Edwards' care and treatment. Dr. Faruque placed Mrs. Edwards on a low-dose regimen of heparin, an anti-coagulant. To assist her in managing Mrs. Edwards' care, Dr. Faruque called in a number of specialists. These specialists included, but were not limited to, the following doctors: Dr. Juda, a critical care physician; Dr. Scott, an intensivist; and Dr. Rosen, a cardiologist. Mrs. Edwards did not recover, and she died in the hospital as a result of the pulmonary embolism. When she died, Mrs. Edwards was only forty years old.

According to Edwards and his expert witnesses, the heparin dosage that Dr. Faruque had ordered for Mrs. Edwards was too low to be therapeutic. Edwards maintained that the other doctors called in by Dr. Faruque to assist her were aware that the treatment plan for Mrs. Edwards was inadequate, but none of them informed Dr. Faruque of this or suggested alternative treatments that would have been effective. Dr. Faruque relied on Dr. Rosen for a cardiac consultation regarding Mrs. Edwards. Edwards' claim against Dr. Rosen was based on the theory that he knew or should have known that Dr. Faruque's treatment plan was inadequate and ineffective, but he failed to communicate this to Dr. Faruque and the other doctors and to recommend alternative treatments that would have been effective. Edwards maintained that Dr. Rosen's involvement with Mrs. Edwards' treatment breached the applicable standard of care. Edwards had made similar claims against the other specialists involved in Mrs.

Edwards' care. Thus a claim that Dr. Faruque and the other doctors were negligent in connection with the care and treatment of Mrs. Edwards was inseparable from Edwards' claim against Dr. Rosen. Indeed, before the amendment involving Dr. Scott and Dr. Juda made on the eve of trial, Dr. Rosen had already raised a Fabre defense naming Dr. Faruque.

As the majority notes, Edwards claimed "that he would have presented his case differently if Dr. Rosen was not going to place the Fabre defendants [Dr. Scott and Dr. Juda] on the verdict form." However, Edwards' theory of the case against Dr. Rosen remained consistent throughout the pretrial proceedings and the trial. For example, in her opening statement at trial, Edwards' counsel told the jury that Dr. Rosen

> needed to make a recommendation for either an IVC filter or full-dose heparin. Dr. Rosen should have followed up with this patient the next day. He sees her on March 14th and never sees her again. He should have seen her on March 15th and, again, communicated with Dr. Faruque, Dr. Scott[,] and Dr. Juda. . . .

In her closing remarks to the jury, after the last-minute withdrawal of the Fabre defense, Edwards' counsel made a similar argument supporting a breach of the standard of care by Dr. Rosen based on his failure to call to the attention of Dr. Faruque and the other doctors involved with Mrs. Edwards' care the inadequacy of the treatment plan:

> Who on March 14 was in the best position to have these treatment option discussions with Dr. Faruque and Dr. Juda? It was Dr. Rosen. We know that she was receiving on March 14, 2008[,] low-dose heparin. And we heard testimony that Dr. [Richard Alexander Matthay] and Dr. [J. Michael] Gaziano criticized that method of treatment. It wasn't enough. It wasn't getting the PTT [partial thromboplastin time] therapeutic, meaning that the heparin wasn't being effective for Mary Edwards.

- 15 -

In support of the claim against Dr. Rosen for his omission to correct the alleged failures by the other members of the team of physicians involved with the care and treatment of Mrs. Edwards, the argument made by Edwards' counsel focused on Dr. Rosen's alleged failure to communicate to the other members of the team treating Mrs. Edwards the inadequacy of the treatment plan being followed and the necessity to pursue other options to save Mrs. Edwards' life:

> What would it have taken for Dr. Rosen to have these conversations [with the other doctors]?  All he had to do was either pick up the phone, find Dr. Faruque in the hospital, find Dr. Juda in the ICU, or if you can't, then document it on the echocardiogram report, document it in the consult note. . . .  Tell them, "Hey listen, we've got a serious situation. We've got to consider these treatment options and list them out", because Dr. Rosen was familiar with all of those treatment options. . . .  [I]t's incumbent on the cardiologist according to my experts to be actively engaged in the suggestion with Dr. Faruque and Dr. Juda as to what to do to save Mary Edwards. . . .  [Dr. Rosen] was in the best position to say something to Dr. Faruque and Dr. Juda. . . . Either discuss changing the heparin, which according to the plaintiff's experts more likely than not would have saved her life, or if not place an IVC filter, which more likely than not would have saved Mary Edwards' life according to plaintiff's expert.

In light of these facts, I disagree with the majority's claim that "Edwards presented evidence that all of the treating physicians were negligent in their treatment of Mrs. Edwards in reliance on the fact that Dr. Rosen had pleaded the affirmative defense that the other doctors were negligent." (Emphasis added.)  Edwards' claim of such "reliance" is not supported by his theory of the case.  Dr. Rosen could not have breached the applicable standard of care if the low-dose heparin regime ordered by Dr. Faruque and approved by Dr. Scott and Dr. Juda was adequate and effective.  To establish his claim

- 16 -

against Dr. Rosen, Edwards was required to prove that the other doctors had also breached the applicable standard of care.

For this reason, the trial judge could have rejected as unpersuasive Edwards' claim that the addition to the case of Dr. Scott and Dr. Juda as Fabre defendants on the eve of trial and the subsequent withdrawal of the Fabre defense put him at an unfair disadvantage in the presentation of his case. We should also bear in mind that this case involved a complex claim of medical malpractice with multiple dueling experts in a trial that lasted for six days. The trial judge was in a much better position than we are to determine the impact on the jury of Dr. Rosen's asserted "gamesmanship" and the extent, if any, to which Edwards was unfairly prejudiced in the presentation of his case. See Cloud v. Fallis, 110 So. 2d 669, 673 (Fla. 1959). Because I cannot say that no reasonable judge would have reached the conclusion that Edwards received a fair trial despite Dr. Rosen's procedural maneuvering, I would affirm. "The appellate court should apply the reasonableness test to determine whether the trial judge abused his discretion, to wit, 'discretion is abused only where no reasonable [person] would take the view adopted by the trial court.' " Allstate Ins. Co. v. Manasse, 707 So. 2d 1110, 1111 (Fla. 1998) (quoting Huff v. State, 569 So. 2d 1247, 1249 (Fla. 1990)).