DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

JOHNS HOPKINS ALL CHILDREN'S HOSPITAL, INC.,

Appellant,

v.

MAYA KOWALSKI and JACK KOWALSKI, individually and as
personal representative of the Estate of Beata Kowalski, deceased,

Appellees.

No. 2D2024-0382
_____

October 29, 2025

Appeal from the Circuit Court for Sarasota County; Hunter W. Carroll,
Judge.

Derek M. Stikeleather, Carrie J. Williams, and M. Peggy Chu of Goodell,
DeVries, Leech & Dann, LLP, Baltimore, Maryland; Chris W. Altenbernd
of Banker Lopez Gassler P.A., Tampa; and Eleanor H. Sills of Banker
Lopez Gassler P.A., Tallahassee, for Appellant.

Christine R. Davis of Davis Appeals, PLLC, St. Petersburg, for Amici
Curiae The American Academy of Pediatrics and The Children's Hospital
Association.

Andrew S. Bolin of Bolin Law Group, Tampa, for Amicus Curiae Florida
Hospital Association.

Michael G. Tanner, Kenneth B. Bell, and Justin T. Delise of Gunster,
Yoakley & Stewart, P.A., Jacksonville; Gregory A. Anderson and Jennifer
C. Anderson of Anderson Glenn, LLP, Jacksonville; Seldon J. Childers

and Nicholas P. Whitney of Childers Law, LLC, Gainesville (substituted as counsel for record); and Raymond T. Elligett, Jr. and Amy S. Farrior of Buell Elligett Farrior & Faircloth, P.A., Tampa, for Appellees.

BLACK, Judge.

Johns Hopkins All Children's Hospital, Inc. (JHACH), appeals from the final judgment rendered against it and in favor of Maya Kowalski, Jack Kowalski, and the Estate of Beata Kowalski (collectively, the Kowalskis). The final judgment awarded damages to the Kowalskis for false imprisonment between October 7 and October 13, 2016; intentional infliction of emotional distress; wrongful death for intentional infliction of emotional distress; false imprisonment between October 18 and October 20, 2016; false imprisonment on January 6, 2017; medical negligence; battery on January 6, 2017; battery for unspecified dates; and fraudulent billing. The trial court's erroneous interpretation and application of section 39.203(1)(a), Florida Statutes (2016), and the immunity afforded thereunder, as well as the trial court's erroneous denial of JHACH's motions for directed verdicts and JHACH's motion for a new trial require reversal of the final judgment.

I.     Background

In the fall of 2015, Maya Kowalski was diagnosed with Complex Regional Pain Syndrome (CRPS). Beata Kowalski, Maya's mother and a nurse infusionist, became aware of CRPS prior to Maya's diagnosis through one of Mrs. Kowalski's patients. CRPS is a central nervous system disorder; it is characterized by severe regional pain with no apparent cause. Patients with CRPS experience an array of symptoms including agonizing pain in the affected region or limb, extreme sensitivity to touch, light sensitivity, and lesions.

2

Initial treatments for Maya's CRPS included warm water therapy, physical therapy, nonnarcotic pain medications, and opioids. When the initial treatments failed to relieve Maya's pain and symptoms, Maya began receiving ketamine. This included Mrs. Kowalski taking Maya to Mexico where Maya was placed in a five-day ketamine coma. For a period of approximately eight months prior to her admission to JHACH in October 2016, Maya was being treated with ketamine infusions through a central venous port in her chest. The ketamine infusions were authorized and overseen by Dr. Ashraf Hanna, a pain management doctor. Although ketamine had been the longest used and most successful treatment for Maya's CRPS prior to her admission to JHACH, Maya's physicians had also prescribed other treatments, including hyperbaric oxygen and immune system stimulants. During most, if not the entirety, of her treatment Maya was unable to walk without assistance and was in a wheelchair.

On the day before Maya's admission to JHACH, Dr. Hanna advised Mrs. Kowalski that he had given Maya the maximum dosage of ketamine that could be administered and that it was not helping Maya; Dr. Hanna advised that Maya be taken to JHACH.[1] On October 7, 2016, Mr. Kowalski brought Maya, then ten years old, to the emergency room of JHACH. Maya presented with excruciating pain. Upon Mrs. Kowalski's arrival at JHACH, she was adamant that Maya receive ketamine infusions, and although JHACH was able to confirm with Dr. Hanna that Maya had been in his care and had been receiving high dosages of ketamine, the hospital emergency room notes state that dosages at the level demanded by Mrs. Kowalski could not be administered in the ER.

---

[1] Dr. Hanna did not testify at trial.

3

Maya was ultimately admitted to the pediatric intensive care unit at JHACH (PICU).

Concerned about Mrs. Kowalski's demands for ketamine and perceived inconsistencies between Mrs. Kowalski's recitation of Maya's medical history and JHACH's own observations, a social worker at JHACH—in accordance with JHACH policy—called the Department of Children and Families abuse hotline on October 7, 2016. The following day, October 8, 2016, JHACH contacted Dr. Sally Smith because of the suspected abuse. Dr. Smith, who had privileges at JHACH, is a pediatrician and was the medical director of the Child Protection Team for Pinellas County at that time.[2]

On October 9, 2016, a second call from a social worker at JHACH was made to the Department child abuse hotline. This second call resulted in an immediate investigation.

On October 13, 2016, Maya remained at JHACH but was taken into the Department's custody. The Department filed a dependency shelter petition, requesting that Maya be placed in the shelter care of the Department because Maya had been abused, abandoned, or neglected or was in imminent danger of abuse, abandonment, or neglect. The Department sought medical shelter care for Maya and requested no contact between Maya and Mrs. Kowalski but supervised visits between Maya and Mr. Kowalski and Maya's brother. On October 14, 2016, following a hearing on the Department's petition, Maya was placed in the shelter care of the Department. The dependency court order provided that Mrs. Kowalski was to have no contact with Maya pending

---

[2] Child Protective Teams are used "to supplement the assessment and protective supervision activities of" the Department. § 39.303(3).

psychological evaluations of both Mrs. Kowalski and Maya. The order further provided that the Department would make all efforts to identify an appropriate person at JHACH to supervise visitations between Mr. Kowalski and Maya. Additionally, the order provided that in the event Maya's parents were unwilling, the Department or "the person primarily responsible of [sic] the care management" of Maya was authorized to consent to "ordinary and necessary medical"[3] examination and treatment of Maya.

Thus as of October 13, 2016, Maya was in the custody of the Department, and beginning on October 14, 2016, Maya was under the jurisdiction of the dependency court.

At trial, Mr. Kowalski testified that at some point between October 8 and 13, 2016, he and Mrs. Kowalski requested that Maya be released from JHACH and that JHACH subsequently threatened them with arrest if Maya were to leave the hospital against medical advice. Mr. Kowalski testified that JHACH advised him that Maya could not leave the hospital because Maya had to be safely weaned off medications, including ketamine. Evidence at trial established that JHACH attempted to transfer Maya to another hospital but that the Kowalskis would not consent to the transfer because the insurance codes on the transfer form indicated that Maya had Munchausen syndrome or conversion disorder or was the target of Munchausen syndrome by proxy and did not indicate that Maya was suffering with CRPS. Mr. Kowalski testified that he and

---

[3] Section 39.01(43) defined "[n]ecessary medical treatment" as the "care which is necessary within a reasonable degree of medical certainty to prevent the deterioration of a child's condition or to alleviate immediate pain of a child."

Mrs. Kowalski would not sign the transfer form because they believed it would mean admitting guilt or blame.[4]

Without referencing the limitations and requirements of the dependency court orders, Mr. Kowalski testified that anything that he brought into the hospital had to be approved, whether it was clothing, food, or letters. Food was required to be prepackaged and could not be homemade.

Mr. Kowalski testified that during one of his visits Maya had asked him whether Mrs. Kowalski was in a mental institution. When Mr. Kowalski asked why Maya would say that, Maya told him that a JHACH social worker assigned to Maya, Catherine Bedy, had told Maya that Mrs. Kowalski was receiving mental health treatment.

Mr. Kowalski testified to additional statements made to him by Maya, including instances where nurses had told Maya that her illness was all in her head and where Ms. Bedy had told Maya that "she could be [Maya's] mother while [Maya is] there at the hospital."

Mr. Kowalski also testified regarding his own interaction with Ms. Bedy, wherein she asked him, "Did you ever consider divorcing your wife?" He responded, "What are you talking about?" and Ms. Bedy said, "Oh, forget it," and walked away. Mr. Kowalski relayed to Mrs. Kowalski what had happened during his visits with Maya and the information he had learned.

---

[4] Evidence established that prior to Maya's admission to JHACH in October 2016, concerns had been raised about psychological factors affecting Maya's physical condition by medical professionals who had treated Maya at Tampa General Hospital and Lurie Children's Hospital of Chicago.

Although he was aware that Maya had been moved to a new room on October 18, 2016, Mr. Kowalski testified that he was unaware that the new room—identified by JHACH staff as the EEG room—was under video surveillance until many years after the fact.[5] He testified that he never saw Maya mistreated; likewise, he never saw nurses taking actions that he considered to be cold or unusual.

Maya testified at trial that the commode in the EEG room was far enough from the bed that she would have to stand up and walk to use it, which she could not do. Maya believed that the nurses wanted to provoke her in order to prove that she could walk.

Maya testified that she was not permitted to speak with her mother and that this infuriated her. Although Maya was told that her pain was in her head and that she was making it up, Maya testified that she was not told that physicians believed she had conversion disorder or Munchausen syndrome. One instance Maya relayed involved a specific nurse verbally accosting her for not moving during a bed change. Despite Maya advising the nurse that she could not walk, stand, or roll, the nurse said, "If you don't move right now or else." She recalled that the nurse yelled at her for quite a while, saying: "I know you can move. I know you're faking it. Just stand up. We all know."

The Kowalskis are Catholic, and Maya testified that she was not permitted to receive communion from her parish priest; she did receive communion from a priest associated with JHACH. Maya believed that outside food, including the communion wafer, was not permitted because there was a fear that Mrs. Kowalski would tamper with it or somehow

---

[5] JHACH's admission form includes the following language: "I understand that . . . closed circuit television monitoring of patients care, may be used during the course of treatment."

7

add ketamine to it. She did not testify to the requirements of the dependency court orders in this regard.

Maya reiterated in her own testimony that Ms. Bedy had told her that Mrs. Kowalski was in a mental institution. Maya quickly learned that Ms. Bedy's statement was false, and Maya believed the statement was intended to manipulate Maya into thinking that her mother was sick and therefore making Maya sick. Maya also reiterated that Ms. Bedy told her, "I'm not trying to be your mother, but I can be."

Mrs. Kowalski was born in Poland, and Maya often spoke in Polish with her mother before her admission to JHACH. Although the dependency court eventually permitted Mrs. Kowalski to have supervised phone and FaceTime calls with Maya, Maya was not permitted to speak Polish with her mother, and the calls were limited to basic and insignificant things. An audio recording was played of one conversation wherein a female voice advised Mrs. Kowalski that "[w]e are not allowed to talk about the [dependency] case" after Mrs. Kowalski told Maya that as soon as the judge makes the decision she would be able to see Maya again.[6]

A final instance involving Ms. Bedy occurred when Ms. Bedy took photographs of Maya before Maya left the hospital for a dependency court hearing on January 6, 2017. Maya testified that Ms. Bedy came to Maya's room and told Maya that if Maya wanted to go to court, she was going to have to be "stripped naked and photographed." Ms. Bedy and a

---

[6] Maya recalled that this was Ms. Bedy redirecting the conversation; however, JHACH introduced into evidence an email from Charlotte LaPorte, a Department social worker assigned to Maya's case, stating that Ms. LaPorte redirected Mrs. Kowalski during that conversation.

nurse did photograph Maya before court; Maya was wearing a training bra and shorts in the photographs. She understood that the photos were for purposes of the dependency case.

Maya testified that she was in worse condition when she was released from JHACH in January 2017 than when she was admitted. She also testified that by her seventh- and eighth-grade years in school, August 2018 through May 2020, she was participating in physical activities without restrictions.

Ms. Bedy's deposition was played for the jury. She testified that she was a licensed clinical social worker at JHACH at the time of Maya's admission. Ms. Bedy testified that she was required to follow the dependency court shelter orders and that it was the dependency court that determined who Maya could see and when. She also testified that court orders provided general parameters but that the Department and JHACH, to some extent, determined how to implement those parameters. Ms. Bedy testified concerning the initial calls to the Department abuse hotline and the rationale behind those calls.[7] She also testified that "95% of the time that [she] saw [Maya], [Maya] was up in her wheelchair. And the times that she would report extraordinary pain would be when she was prompted by her mother" or "if somebody asked her if she was having pain." She further testified that

> JHACH noted on several occasions where [Maya] was moving her legs, moving her hands without any pain. [Maya] was engaging in activities such as foosball, cutting out and making crafts in the craft room. She was out playing the piano downstairs and often moved herself around the

---

[7] Much of Ms. Bedy's testimony concerned actions authorized or required by chapter 39 and responses to questions mischaracterizing JHACH's continued involvement as "taking this child away from her parents."

hospital. It was only after we gave that information to [the Department] that [Maya] then decided—or quit moving herself around the hospital for a few days.

In one of her case notes, Ms. Bedy wrote: "[Maya] told me she was furious, angry, and in pain. She told me she can't talk or trust anyone, that she knows there is court on Monday, and it's all lies."

Ms. Bedy testified that JHACH has a policy against recording phone calls and that she therefore objected to Mrs. Kowalski recording calls with Ms. Bedy. She also testified that whether Maya was permitted to see her priest was up to the dependency court. Ms. Bedy testified that the Department asked that JHACH monitor Maya's calls and that at times calls came through Ms. Bedy's phone and she would put her phone on speaker to allow Maya to have the conversation. Ms. Bedy supervised phone calls between Maya and Mrs. Kowalski once the dependency court authorized supervised limited contact. At no time did the dependency court authorize in person visitation between Maya and Mrs. Kowalski.

Ms. Bedy testified that in January 2017, JHACH's risk management department asked Ms. Bedy and another person to take photographs of Maya before she was taken to a January 6 dependency court hearing; the request for photographs had been made by an attending physician at JHACH. Ms. Bedy testified that "in the professional context" and "in the foster care program" photographs are taken "if there [are] injuries." She confirmed that at the time of the photographs Maya was in the custody of the Department and that the Department was "getting ready to take their own pictures" as well. No one explained to Ms. Bedy why she was taking photographs of Maya. Ms. Bedy noted that the email she received addressed concerns that Maya was "self-mutilating" and had scratches on her body.

10

On January 6, 2017, the dependency court ordered that Maya would remain sheltered at JHACH and set a February 2017 trial date. Mrs. Kowalski committed suicide the following day, January 7, 2017, leaving two suicide notes. Those notes reflect Mrs. Kowalski's sadness and frustration with the dependency court proceedings and those involved with the dependency proceedings, including JHACH, the Department, and Dr. Smith.

One week after Mrs. Kowalski's suicide, on January 13, 2017, the dependency court allowed Maya to be released from JHACH and to resume living with Mr. Kowalski. The dependency case was ultimately dismissed. During the months that Maya was sheltered at JHACH, she was weaned off ketamine, and the dependency court order releasing Maya from JHACH prohibited additional ketamine treatments. Maya had been admitted to JHACH in severe pain, unable to walk, and receiving high doses of ketamine; when she was discharged from JHACH, she was still in significant pain and unable to walk. At the time of trial, the only medications she routinely took were Claritin, Flonase, and a sleep aid; she had been able to walk, run, and ice skate. Maya testified that she had experienced no CRPS flare-ups in the three years following her January 2017 discharge from JHACH.

The Kowalskis filed their lawsuit on October 5, 2018. The operative eighth amended complaint was filed on January 24, 2023. More than fifty pretrial motions were litigated and resolved before this legally complex and emotionally charged case was heard by a jury beginning on September 14, 2023. During the two-month trial, additional motions were filed and resolved, including multiple motions for directed verdicts.

On November 9, 2023, the jury returned a verdict in favor of the Kowalskis on all remaining claims. Postverdict, JHACH filed an omnibus

11

renewed motion for directed verdict, motion for new trial, and motion for remittitur. The court denied, largely without elaboration, the renewed motion for directed verdict and motion for new trial. It granted in part the motion for remittitur. The court then entered the final judgment.

II. Analysis

A. Standards of review

Issues of statutory interpretation are reviewed de novo. *M.K. v. Dep't of Child. & Fams.*, 380 So. 3d 469, 472 (Fla. 4th DCA 2023) (citing *B.Y. v. Dep't of Child. & Fams.*, 887 So. 2d 1253, 1255 (Fla. 2004)).

"A trial court's decision on a motion for directed verdict presents a question of law—the sufficiency of a party's evidence—that we review de novo." *Kim v. Jung Hyun Chang*, 249 So. 3d 1300, 1305 (Fla. 2d DCA 2018) (citing *Fell v. Carlin*, 6 So. 3d 119, 120 (Fla. 2d DCA 2009)). When considering whether the trial court should have granted a directed verdict, we "must evaluate the testimony in the light most favorable to the nonmoving party and every reasonable inference deduced from the evidence must be indulged in favor [of] the nonmoving party." *Winter Haven Hosp., Inc. v. Liles*, 148 So. 3d 507, 515 (Fla. 2d DCA 2014) (alteration in original) (quoting *GEICO Gen. Ins. v. Hoy*, 136 So. 3d 647, 651 (Fla. 2d DCA 2013)).

Our review of the denial of a motion for new trial is for an abuse of discretion. *Edwards v. Rosen*, 189 So. 3d 177, 182 (Fla. 2d DCA 2016). "In reviewing an order on a motion for a new trial, an appellate court should consider the totality of all errors and improprieties." *Id.* at 182-83 (citing *Manhardt v. Tamton*, 832 So. 2d 129, 132-33 (Fla. 2d DCA 2002)).

B. Section 39.203(1)(a) immunity

12

Pretrial, JHACH moved for partial summary judgment based on the immunity afforded pursuant to section 39.203(1)(a). JHACH argued, as relevant to this appeal, that every claim against it, except the battery claims, was precluded as a matter of law because JHACH had reasonable cause to report suspected child abuse and was otherwise participating in chapter 39 proceedings. The trial court granted in part and denied in part the motion based on its interpretation and application of section 39.203(1)(a) to the Kowalskis' claims. JHACH argued in its postverdict motions that a new trial is warranted based on the trial court's narrow interpretation and erroneous application of the statutory immunity. On appeal, JHACH again seeks a new trial based on the court's erroneous rulings with regard to section 39.203(1)(a) and their pervasive impact on the trial.

The trial court considered two sections of chapter 39 and applicable precedent addressing the statutory language. Section 39.201(1)(a) addresses mandatory reporting of child abuse and provides, in relevant part: "Any person who knows, or has reasonable cause to suspect, that a child is abused, abandoned, or neglected by a parent . . . shall report such knowledge or suspicion to the [D]epartment in the manner prescribed by subsection (2)." Physicians, nurses, and "hospital personnel engaged in the admission, examination, care, or treatment of persons," as well as other "health or mental health professional[s]," are required to provide their names to the abuse hotline when making a report. § 39.201(1)(d)1-2. Suspected child abuse by a parent must be reported "immediately." § 39.201(2)(a).[8] And any person who is required

_____

[8] Notably, the Department also bears responsibility under section 39.201:

13

to report "known or suspected child abuse" and who fails to do so commits a felony. § 39.205(1).

Section 39.203(1)(a) addresses actions authorized or required by chapter 39, as well as reporting child abuse, and provides:

> Any person, official, or institution participating in good faith in any act authorized or required by this chapter, or reporting in good faith any instance of child abuse, abandonment, or neglect to the [D]epartment or any law enforcement agency, shall be immune from any civil or criminal liability which might otherwise result by reason of such action.

In construing section 39.201(1)(a), the trial court also considered *Urquhart v. Helmich*, 947 So. 2d 539 (Fla. 1st DCA 2006), and *Ross v. Blank*, 958 So. 2d 437 (Fla. 4th DCA 2007). Both cases address only reports of suspected child abuse and the immunity afforded thereto. In *Urquhart*, the court concluded that

> there are two ways in which a doctor can be immune from civil liability for making an incorrect report of child abuse. Immunity exists as a matter of law if the doctor has reasonable cause to suspect that the child has been abused and makes a report of the abuse as required by law. In that event, there is no need to determine whether the doctor acted in good faith. . . . [O]nce reasonable cause has been shown, "a reporter complying with the statutory mandate to make a

---

If it appears that the immediate safety or well-being of a child is endangered, that the family may flee or the child will be unavailable for purposes of conducting a child protective investigation, or that the facts otherwise so warrant, the [D]epartment shall commence an investigation immediately, regardless of the time of day or night. In all other child abuse, abandonment, or neglect cases, a child protective investigation shall be commenced within 24 hours after receipt of the report.

§ 39.201(5). The shelter petition in this case alleged—and the dependency court found—that shelter was appropriate based on evidence of abuse and imminent danger.

report is, by definition, operating, in good faith."  However, the absence of reasonable cause does not prove liability; it merely removes the immunity that would otherwise apply as a matter of law.  If the objective evidence does not support a conclusion that the doctor had reasonable cause to make the report, the doctor may nevertheless claim immunity from civil liability by showing that the report was made in good faith.

947 So. 2d at 542 (citations omitted) (quoting *O'Heron v. Blaney*, 583 S.E.2d 834, 836 (Ga. 2003)).[9]  Citing *Urquhart*, the court in *Ross* likewise concluded that if a reasonable basis existed to report child abuse, the motive in making the report is irrelevant.  958 So. 2d at 441.

Based on the facts before it and the above-cited precedent, the trial court determined—"very easily"—that JHACH had reasonable cause to report suspected child abuse to the Department hotline.  Accordingly, the trial court found that JHACH was "entitled to section 39.203(1)(a) immunity from any civil claim 'which might otherwise result by reason of' the report[s]."  But the court said nothing of immunity for claims resulting from "participat[ion] in good faith in any act authorized or required by [chapter 39]."  *See* § 39.203(1)(a).

The facts of this case are unusual in that the reporter for purposes of sections 39.201 and 39.203 remained a participant in Maya's care beyond the initial shelter hearing and was required to comply with the dependency court orders by virtue of the Department designating Maya's

_____

[9] The trial court expressed trepidation in applying the *Urquhart* analysis insofar as *Urquhart* concluded that "the immunity that is afforded to a medical doctor . . . is not the same as that afforded to an ordinary citizen," *see* 947 So. 2d at 542, where neither section 39.201 nor section 39.203 differentiate between doctors and ordinary citizens except that the former are required to give their names when making a report while the latter may remain anonymous.  While we might agree with the trial court on that narrow issue, application of the statutory immunity as between doctors and ordinary citizens is not before us.

placement with JHACH. As the shelter placement, JHACH was required to implement the dependency court orders. Those orders required JHACH to comply with visitation guidelines set forth in the orders, as well as to manage correspondence between Maya and Mrs. Kowalski.[10] Moreover, the orders directed that the court would not micromanage or countermand JHACH's policies and that absent "clear and compelling reasons," JHACH's staff was to "be free to address the medical needs of their patients without the court, the parents, or others interfering with their professional judgment."

JHACH was required to take part in the sheltering of Maya by virtue of the shelter order entered October 14, 2016. The Department sought to have Maya sheltered based on ongoing abuse and imminent danger; the dependency court sheltered Maya, and the Department was authorized to determine her placement. The Department placed Maya at JHACH for ongoing medical treatment, including psychological evaluation and weaning off ketamine.

Within the text of chapter 39, the legislature established its intent expressly: "The purposes of this chapter are . . . [t]o provide for the care, safety, and protection of children . . . and to prevent the occurrence of child abuse, neglect, and abandonment." § 39.001(1)(a). The legislature further stated its intent that chapter 39 "be liberally interpreted and construed in conformity with its declared purposes." § 39.001(12).

"[C]ourts may not extend, modify, or limit the statute's express terms or its reasonable or obvious implications because to do so would be an abrogation of legislative power." *Searcy, Denney, Scarola, Barnhart*

---

[10] The dependency court orders included directives on screening visitors through the Department and who specifically would be permitted visitation.

*& Shipley v. State*, 209 So. 3d 1181, 1189 (Fla. 2017). "Moreover, 'all parts of a statute must be read together in order to achieve a consistent whole.' " *Id.* (quoting *Borden v. E.–Eur. Ins.*, 921 So. 2d 587, 595 (Fla. 2006)). Effect must be given to every clause of the statute and meaning given to all of its parts. *See Alvarez-Sowles v. Pasco County*, 386 So. 3d 224, 229 (Fla. 2d DCA 2024) (quoting *Larimore v. State*, 2 So. 3d 101, 106 (Fla. 2008)).

Here, the trial court erred by not considering the entirety of section 39.203(1)(a) and its application to the facts of this case beyond JHACH's immunity from claims premised on or immediately resulting from the reports of suspected child abuse. And nothing in the record suggests that JHACH's participation in implementing the dependency court orders, as it was required to do, was not done in good faith. *Cf. Dep't of Health & Rehab. Servs. v. Dougherty*, 700 So. 2d 77, 79 (Fla. 2d DCA 1997) ("Although the process was unfortunately slow and painful for the Doughertys, nothing reveals that the investigation was not instituted and conducted in good faith after a legitimate report of abuse . . . . As such, the Department, as an 'institution participating in good faith' in acts 'authorized or required by ss. 415.502-415.514,' was 'immune from civil . . . liability which might otherwise result by reason of its action.' " (quoting § 415.511(1)(a), Fla. Stat. (1995) (current version at § 39.203(1)(a), Fla. Stat.))); *Pope v. State*, 246 So. 3d 1282, 1283 (Fla. 1st DCA 2018) ("The State argues (correctly) that Pope could have and should have done more. But the [l]egislature did not condition immunity on doing more than seeking medical assistance in good faith. The [l]egislature could have imposed more conditions."). The statutory scheme at issue is "intended to protect those who might be overzealous in protecting children from potential abuse." *See Floyd v. Dep't of Child.*

17

*& Fams.*, 855 So. 2d 204, 206 (Fla. 1st DCA 2003) (discussing section 425.511(1)(a), a predecessor to section 39.203(1)(a)). This is not to suggest that section 39.203(1)(a) provides absolute immunity. It provides immunity from liability that might otherwise result from good faith reporting or good faith participation in acts authorized or required by chapter 39. *Cf. Dep't of Health & Rehab. Servs. v. Yamuni*, 529 So. 2d 258, 262 (Fla. 1988) ("Section 827.07(7)[, Florida Statutes (1979),] protects against liability for carrying out the protective measures of chapter 827 on behalf of the protected class, it does not protect against failing to carry out the protective measures." (citing § 827.07, Fla. Stat. (1979) (current version at § 39.203, Fla. Stat.))).

There are complexities created by the interplay of chapter 39 with the claims raised in this case. We are aided in interpreting and applying chapter 39 by the amicus curiae briefs filed by the American Academy of Pediatrics, the Children's Hospital Association, and the Florida Hospital Association. The Florida Hospital Association (FHA) articulated its concerns with the trial court's ruling in this case:

> [T]he trial court found as a matter of law that [JHACH] had a reasonable basis for suspecting that their patient was the subject of child abuse; that [JHACH] acted in good faith in reporting that suspicion; and that [JHACH] could not be held liable for any cause of action directly arising from sheltering the child pursuant to a court order. Unfortunately, these findings were rendered meaningless at the trial itself when the court permitted [the Kowalskis] to attack [JHACH's] basis for suspecting abuse, its motives for reporting that suspicion, and present evidence to the jury of the psychological impact of the court-ordered sheltering period. . . . [T]he actions of [JHACH] with respect to their good faith, mandatory reporting were repeatedly called into question and leveraged by the [Kowalskis] in their effort to secure a finding of civil liability and an award for damages.

18

The trial court found that "section 39.203(1)(a) immunity flows for any civil liability that may result by reason of the [child abuse] report" and that "[w]ithout question, an investigation, shelter, removal of custody, and prohibiting visitation all are outcomes that logically could occur from a report to the abuse hotline."[11] The trial court implicitly recognized that dependency court orders, that is, those sheltering a child and restricting or prohibiting visitation, may result from the reporting and investigation of abuse. Yet the trial court failed to give effect to its interpretation by permitting the jury to hear significant and inflammatory testimony concerning the restrictions put in place by the dependency court and the impacts of those restrictions on the Kowalskis. For example, Mr. Kowalski testified that Mrs. Kowalski lost consciousness and fell to the floor upon learning that she was not going to be able to see Maya and that during the time that she was unable to see Maya, Mrs. Kowalski deteriorated; she was losing hope. He repeatedly testified to the profound impacts of the dependency court orders on Mrs. Kowalski. Maya also testified to the impacts of the dependency court orders on her, from anger in not being able to speak with or see her mother to feelings of isolation. Maya testified that she was suspicious about the comments made to her and the restrictions placed on her; no one ever "directly told

---

[11] Whether the trial court's interpretation is correct in this respect has not been raised by the parties to this appeal. We note, however, that the plain language of the statute provides immunity from civil liability resulting from good faith abuse reports. Whether civil liability results from, or as the trial court found "flows from," the abuse reports or from other acts authorized or required by chapter 39 is not a distinction we must draw in this case because JHACH was required to comply with dependency court orders as a matter of its good faith participation in the chapter 39 proceedings regardless of whether its compliance with court orders flowed from the abuse reports.

19

[her] what was going on," and she had to figure out for herself that she was being "stripped from [her] family." She testified that JHACH provided her with a "My Care Journal" and that in it she listed names of JHACH doctors and nurses with notations and drawings: "I was trying to get out of the hospital, and I'm 10. So I'm thinking if they think I like you, then I'll get out."[12]

The trial court erred by not giving effect to that portion of the statute to which it assigned meaning, and it further erred by not giving meaning to all words within the statute. *See N. Broward Hosp. Dist. v. Agency for Health Care Admin.*, 398 So. 3d 1038, 1043 (Fla. 1st DCA 2024) ("Courts must give significance and effect to every word and phrase in a statute."). Section 39.203(1)(a) provides immunity from civil liability "which might otherwise result by reason of" both "reporting in good faith any instance of child abuse" and "participating in good faith in any act authorized or required by" chapter 39. Ninety-one of Maya's ninety-seven days in JHACH were the result of dependency court orders wherein the Department had been given placement and care responsibility of Maya while she remained under protective supervision. JHACH argues

---

[12] The closing arguments were also inflammatory: Counsel for the Kowalskis argued that JHACH "took [Mrs. Kowalski] out of the game" by "changing its diagnosis" and treating the Kowalskis "like criminals." Counsel then went through JHACH's defenses because "if we get rid of the defenses, then all that [is] left is [the Kowalskis'] case." Counsel for the Kowalskis argued that "something happened [between Mrs. Kowalski and JHACH] that ticked [JHACH] off," causing JHACH to call the Department, and that JHACH was not "going to let this brusque lady with an Eastern European accent come in and tell[] them how to do their job." They argued that JHACH calling the Department hotline was retaliatory against Mrs. Kowalski and that she committed suicide because she knew that if she did not take drastic action Maya would "end up in some kind of foster care" or die.

that the trial court's errors in interpreting and applying section 39.203(1)(a) immunity should result in a new trial for all claims.[13] We agree that the trial court's rulings on section 39.203(1)(a) immunity permeated the entire trial; a new trial is required on all counts not otherwise disposed of by this opinion.

C. False imprisonment: October 7-13, 2016

The trial court denied JHACH's motion for directed verdict as to the false imprisonment claim for JHACH's actions between October 7 and October 13, 2016.[14] This was error.

"The essential elements of a cause of action for false imprisonment include: (1) the unlawful detention and deprivation of liberty of a person; (2) against that person's will; (3) without legal authority or 'color of authority'; and (4) which is unreasonable and unwarranted under the circumstances." *Mathis v. Coats*, 24 So. 3d 1284, 1289-90 (Fla. 2d DCA 2010) (citing *Montejo v. Martin Mem'l Med. Ctr., Inc.*, 935 So. 2d 1266,

---

[13] We note that JHACH has not argued that evidence of good faith participation in actions authorized or required by chapter 39 is not admissible because such actions cannot form the basis for liability. The FHA, however, contends that "[i]f a party is immune from any civil liability that might otherwise result by reason of certain conduct, then evidence of such conduct should not be offered as part of an effort to support a finding of any form of civil liability" and that "[o]ffering such evidence 'creates an obvious and significant danger of "unfair prejudice, confusion of issues, [and] misleading the jury." ' " *See* § 90.403, Fla. Stat. (2023).

[14] Although JHACH sought summary judgment for this false imprisonment claim, as well as the other false imprisonment claims, on the basis of section 39.203(1)(a) immunity, JHACH does not challenge the court's denial of its motion for summary judgment. The only challenge it raises on appeal as to the October 18 through October 20 and January 6 false imprisonment claims concerns punitive damages.

1268 (Fla. 4th DCA 2006)). All elements must be proven for a plaintiff to recover on a false imprisonment claim. *Montejo*, 935 So. 2d at 1268.

The October 7 through October 13 allegations stem from JHACH's refusal to release Maya from the ER and PICU. JHACH argues both that it had legal authority and that there was no evidence that keeping Maya in its care was unreasonable and unwarranted under the circumstances, whether because of Maya's pain levels and overall health at the time or because of the suspected child abuse.

We need only consider whether the hospital was without legal authority or color of authority, a question of law, to resolve this issue. *See Whipple v. Dep't of Corr.*, 892 So. 2d 554, 558 (Fla. 3d DCA 2005); *see also Citizens of State v. Graham*, 191 So. 3d 897, 900 (Fla. 2016) ("Whether the [Florida Public Service Commission] has the authority to act is a question of law, which is subject to de novo review."). JHACH's legal authority or color of authority stems from section 39.395:

> Any person in charge of a hospital or similar institution, or any physician or licensed health care professional treating a child *may detain that child without the consent of the parents*, caregiver, or legal custodian, whether or not additional medical treatment is required, *if the circumstances are such, or if the condition of the child is such that returning the child to the care or custody of the parents, caregiver, or legal custodian presents an imminent danger to the child's life or physical or mental health.*

(Emphasis added.) We are mindful that section 39.395 also requires that "[a]ny such person detaining a child shall immediately notify the [D]epartment" and that "the [D]epartment shall immediately begin a child protective investigation in accordance with the provision of this chapter." Beyond the initial detention and reporting to the Department, the

22

legislature has placed no burden on the person detaining the child; instead, it has placed the burden on the Department:

> If the department determines, according to the criteria set forth in this chapter, that the child should be detained longer than 24 hours, it shall petition the court through the attorney representing the Department of Children and Families as quickly as possible and not to exceed 24 hours, for an order authorizing such custody in the same manner as if the child were placed in a shelter.

*Id.* Certainly, section 39.395 provides color of authority for JHACH's detention of Maya in the ER and PICU during the period between the first and second reports to the Department. And following the second report, on October 9, 2016, the Department instituted its investigation.

Moreover, JHACH's actions were authorized or required by chapter 39, and there is no evidence that its participation was not in good faith, particularly where the trial court concluded as a matter of law that JHACH had reasonable cause to suspect child abuse. As such, JHACH is immune from liability resulting from its detention of Maya between October 7 and October 13, 2016.

Accordingly, JHACH's motion for directed verdict on the claim of false imprisonment for the period of October 7 through October 13, 2016, should have been granted.[15]

D. Intentional infliction of emotional distress: Beata Kowalski

Two claims of intentional infliction of emotional distress (IIED) specific to Beata Kowalski were resolved by the jury in favor of the Kowalskis after the trial court denied JHACH's motions for directed verdicts. JHACH contends that its motions for directed verdicts should

---

[15] JHACH's issue concerning the corresponding motion for directed verdict on punitive damages is therefore rendered moot.

23

have been granted because the Kowalskis failed to present evidence of conduct directed at Mrs. Kowalski and the Kowalskis' evidence was insufficient as a matter of law. We agree.[16]

> To support a claim for IIED, a plaintiff must prove:
>
> (1) the wrongdoer's conduct was intentional or reckless, that is, he intended his behavior when he knew or should have known that emotional distress would likely result;
>
> (2) the conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community;
>
> (3) the conduct caused emotional distress; and
>
> (4) the emotional distress was severe.

*Glegg v. Van Den Hurk*, 379 So. 3d 1171, 1174 (Fla. 4th DCA 2024) (quoting *Brown v. Brown*, 800 So. 2d 359, 362-63 (Fla. 4th DCA 2001)); *accord Metro. Life Ins. v. McCarson*, 467 So. 2d 277, 278-79 (Fla. 1985) (quoting Restatement (Second) of Torts § 46 (1965)). The trial court must make the initial determination on a motion for directed verdict that the evidence presented meets that high standard. *Liberty Mut. Ins. v. Steadman*, 968 So. 2d 592, 595 n.1 (Fla. 2d DCA 2007); *see Calvert ex. rel. Est. of Duckett v. Cable News Network LLLP*, No. 5:06-CV-444-OC-10GRJ, 2008 WL 2959753, at *4 (M.D. Fla. July 31, 2008) ("Pleading a cause of action for intentional infliction of emotional distress is one thing, avoiding summary judgment or prevailing at trial is quite another."). And "because the outrageousness test is objective," testimony as to the plaintiff's beliefs on whether the defendant intended to cause emotional distress is "of no moment." *Mellette v. Trinity Mem'l Cemetery, Inc.*, 95 So. 3d 1043, 1049 (Fla. 2d DCA 2012). Likewise, "the subjective

---

[16] We therefore decline to address JHACH's argument that Florida does not recognize IIED suicide.

response of the person who is the target of the actor's conduct does not control the question of whether the tort of intentional infliction of emotional distress occurred." *Steadman*, 968 So. 2d at 595 (citing *Ponton v. Scarfone*, 468 So. 2d 1009, 1011 (Fla. 2d DCA 1985)).

As relevant to the Estate's IIED claims, "in order to state a claim for IIED based on [one's] own emotional distress, a plaintiff must be present when the alleged extreme and outrageous conducted is directed toward a third party." *Buchanan v. Miami-Dade County*, 400 So. 3d 684, 686 (Fla. 3d DCA 2024); *see also M.M. v. M.P.S.*, 556 So. 2d 1140, 1141 (Fla. 3d DCA 1989) ("Appellants were not present when the alleged mistreatment of their daughter took place and may not claim emotional distress for her injurious or offensive treatment."). Otherwise, the conduct alleged to be outrageous must be directed at the plaintiff. *Baker v. Fitzgerald*, 573 So. 2d 873, 873 (Fla. 3d DCA 1990) ("Appellant's claim for intentional infliction of emotional distress fails because there was no showing of outrageous conduct directed at appellant herself."); *Habelow v. Travelers Ins.*, 389 So. 2d 218, 220 (Fla. 5th DCA 1980) ("In all cases we have found in Florida recognizing the tort of intentional infliction of emotional distress, the plaintiff was the recipient of the insult or abuse, or the message was *clearly directed at the plaintiff* through a third person." (emphasis added)). Stated differently, if the plaintiff is not present to witness the outrageous conduct, the plaintiff must have been the target of the outrageous conduct. *See Steadman*, 968 So. 2d at 595 (citing *Ponton*, 468 So. 2d at 1011).

The Kowalskis presented no evidence that Mrs. Kowalski was the target of any of the conduct alleged to be outrageous; rather, the heart of the Kowalskis' claim, repeated in various ways throughout multiple bench conferences and asserted before the jury, was that the "separation

of mother from child with knowledge by both and without the ability to combat it" was outrageous.  The Kowalskis argued: "[A] plan that is told to the mother that we're going to take away your child, and there's nothing you can do about it"; "the real outrageousness is the systematic nature of the actions against [Mrs. Kowalski] through this.  And everything—every contact that she had and everything she learned reenforced that there was a plan to take her daughter away, and that is outrageous in our society."

The Kowalskis contended that there were concerted efforts to "raise the pressure" on Mrs. Kowalski—"if this doesn't get her, let's suggest that [Mr. Kowalski] get a divorce.  And if this doesn't get her, let's tell [Maya] that I'm going to be her mother."  The Kowalskis acknowledged that "these statements were not made directly to [Mrs. Kowalski] because she wasn't allowed in the hospital but were funneled to [her] through a proxy, which was her child" or her husband.  That Mr. Kowalski or Maya relayed what they had seen or experienced is not evidence that JHACH's actions were directed to Mrs. Kowalski.  And there was no evidence that Mrs. Kowalski was somehow the target of statements made to either Maya or Mr. Kowalski.  *Cf. De La Campa v. Grifols Am., Inc.*, 819 So. 2d 940, 943-44 (Fla. 3d DCA 2002); *Lashley v. Bowman*, 561 So. 2d 406, 409 (Fla. 5th DCA 1990).

Moreover, the trial court recognized that the allegations in the operative complaint were insufficient when it granted JHACH's pretrial motion to dismiss the IIED claim as to Mr. Kowalski.  With the exception of actions immune under section 39.203(1)(a) and the assertion that Mrs. Kowalski suffered from Munchausen syndrome by proxy, there is little difference between the allegations the trial court found legally insufficient

26

as to Mr. Kowalski's claim and the evidence presented as to the Estate's claims.

The Kowalskis' evidence was legally insufficient to survive directed verdict. The motions for directed verdicts on the IIED claims specific to Mrs. Kowalski should have been granted.

E. Intentional infliction of emotional distress: Maya Kowalski

In denying JHACH's motion for directed verdict specific to Maya's IIED claim, the trial court considered evidence for which JHACH should have been immune from liability and evidence of other pleaded torts. This was error.

We reiterate that the actions for which JHACH should have been immune pursuant to section 39.203(1)(a) cannot be used to establish liability. The Department placed Maya with JHACH. JHACH's participation in the chapter 39 proceedings, as well as its initial reports of suspected child abuse to the Department, pervaded the Kowalskis' evidence of intentional infliction of emotional distress against Maya. The trial court was required to consider which of JHACH's actions should have been immune from liability and which actions could support the independently pleaded tort of IIED. Medical professionals' disagreements about a complex medical case and perhaps overzealous implementation of dependency court orders are not acts that are "intolerable in a civilized community." *Cf. Gonzalez-Jiminez de Ruiz v. United States,* 378 F.3d 1229, 1231 (11th Cir. 2004) ("[T]he rendering of substandard medical care does not constitute the intentional infliction of emotional distress." (quoting *Gonzalez–Jimenez de Ruiz v. United States,* 231 F. Supp. 2d 1187, 1200 (M.D. Fla. 2002))). Good faith actions to protect children are neither "utterly intolerable in a civilized community" nor "beyond all possible bounds of decency." Indeed, section 39.203(1)(a) immunity

27

"protect[s] those who might be overzealous in protecting children from potential abuse." *See Floyd*, 855 So. 2d at 206. To the extent JHACH took actions within its legal rights, under chapter 39 or otherwise, it cannot be liable for IIED. *See Canto v. J.B. Ivey & Co.*, 595 So. 2d 1025, 1028 (Fla. 1st DCA 1992) ("A privilege exists as a matter of law to engage in reckless or even outrageous conduct if there is sufficient evidence that shows the defendant 'did no more than assert legal rights in a legally permissible way.' " (quoting *Metro. Life Ins.*, 467 So. 2d at 279)).

Additionally, IIED conduct must not be "violative of any other recognized tort." *Foshee v. Health Mgmt. Assocs.*, 675 So. 2d 957, 960 (Fla. 5th DCA 1996). That is, the facts upon which it is based must be independent of any other alleged tort. *See id.* ("Because the actions of the chargeable defendants here can be deemed to fit within the false imprisonment category those actions will not support a claim of intentional infliction of emotional distress."); *cf. Fridovich v. Fridovich*, 598 So. 2d 65, 69-70 (Fla. 1992) ("Obviously, if the sole basis of a complaint for emotional distress is a privileged defamatory statement, then no separate cause of action exists. . . . [A] plaintiff cannot transform a defamation action into a claim for intentional infliction of emotional distress simply by characterizing the alleged defamatory statements as 'outrageous.' " (citation omitted)). Where the conduct alleged to be outrageous is itself a pleaded tort, a claim of IIED cannot lie. *Boyles v. Mid-Fla. Television Corp.*, 431 So. 2d 627, 636 (Fla. 5th DCA 1983). Here, the Kowalskis relied upon evidence of other pleaded torts in order to establish the IIED claim. The law is clear, however, that the evidence supporting Maya's three false imprisonment claims, as well

28

as her battery claims and medical negligence claim, cannot also be used to meet the legal threshold for her IIED claim.[17]

F.  Medical negligence: apparent agency

JHACH contends that the trial court erred in denying its motion for directed verdict on the narrow issue of apparent agency as it relates to Dr. Smith and that chapter 39 otherwise immunizes Dr. Smith's actions such that JHACH cannot be held liable for those actions.  We agree.

"An apparent agency exists only if all three of the following elements are present: (a) a representation by the purported principal; (b) a reliance on that representation by a third party; and (c) a change in position by the third party in reliance on the representation."  *Roessler v. Novak*, 858 So. 2d 1158, 1161-62 (Fla. 2d DCA 2003) (citing *Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 121 (Fla. 1995)).

Mr. Kowalski testified that he was unaware that Dr. Smith was not a JHACH doctor at the time he first met her, but he could not specify the date.  He testified that she was wearing a white lab coat when she came into Maya's room and started asking questions.  Maya testified that she

---

[17] Further, evidence supporting the negligent hiring and supervision claim cannot be used.  That claim was resolved in favor of JHACH.  And while the Kowalskis argued that "[t]he evidence taken as a whole indicates that there was a desire and plan on the part of [Ms.] Bedy to separate [Maya] from [Mrs. Kowalski]" and that "[t]here was a plan by the hospital to force [Mrs. Kowalski] and [Maya] . . . and [Mr. Kowalski] to change their story," to the extent that such evidence is not subject to section 39.203(1)(a) immunity, there is no evidence of any such concerted effort.  *Cf. Mellette*, 95 So. 3d at 1049 (concluding that plaintiff's testimony as to her beliefs on whether defendant intended to hurt her was "of no moment"); *Ponton*, 468 So. 2d at 1011 ("[T]he subjective response of the person who is the target of the actor's conduct is not to control the question of whether the tort [of IIED] occurred.").  Moreover, the trial court granted summary judgment in favor of JHACH on the Kowalskis' conspiracy claim pretrial.

was unaware of who Dr. Smith was or in what capacity she questioned Maya's father. An email dated October 12, 2016, from Mrs. Kowalski's email address was entered into evidence. In the email, Mrs. Kowalski reported that on October 11, 2016, she and Dr. Sally Smith, "who was sent by [the Department] to investigate th[e] possible child abuse/neglect," had a second visit at which Mrs. Kowalski described Maya's illness and the doctors involved in Maya's care.

Thus no later than October 11, 2016, Mrs. Kowalski was aware that Dr. Smith was acting in her capacity as a Child Protective Team (CPT) physician. And certainly, by the October 14 shelter hearing, Mr. Kowalski was also aware. The Kowalskis presented no evidence that they materially changed their position prior to October 11 or October 14 on the basis of Dr. Smith being an apparent agent of JHACH. Rather, the Kowalskis acknowledge that they were unaware that JHACH had given Dr. Smith full access to Maya's medical records at the time such access was provided. The apparent agency theory should have been rejected as a matter of law by the trial court, and a directed verdict as to that specific claim should have been granted.

Nonetheless, even were Dr. Smith an apparent agent of the hospital, because Dr. Smith was the CPT medical director, she was authorized by chapter 39 to take the actions that she took. *See generally* §§ 39.303, .407. Her actions would not subject JHACH to liability unless JHACH was not participating in good faith in acts authorized by chapter 39. It was the Kowalskis' burden to prove either that JHACH was not participating in good faith in authorized or required acts or that Dr. Smith was not acting in her capacity as the CPT medical director. In admitting evidence of Dr. Smith's actions without proper consideration of

30

the statutory immunity, the trial court relieved the Kowalskis of their burden.

### G. Punitive damages

JHACH contends that the trial court erred in denying its motion for directed verdict on the issue of punitive damages as to the false imprisonment and battery claims.[18]

"In all civil actions, the plaintiff must establish at trial, by clear and convincing evidence, its entitlement to an award of punitive damages." § 768.725, Fla. Stat. (2023). And "[a] defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." § 768.72(2). Clear and convincing evidence, an intermediate burden of proof,

> requires that the evidence must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; *the testimony must be precise and explicit and the witnesses must be lacking in confusion as to the facts in issue.* The evidence must be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established.

*S. Fla. Water Mgmt. Dist. v. RLI Live Oak, LLC*, 139 So. 3d 869, 872 (Fla. 2014) (emphasis added) (quoting *Inquiry Concerning a Judge*, 645 So. 2d 398, 404 (Fla. 1994)).

---

[18] Although our reversal of the judgment as to the October 7 through October 13 false imprisonment claim moots the issue specific to that claim, we would have otherwise concluded that directed verdict was warranted as to punitive damages because JHACH's actions during that period do not meet the definition of either intentional misconduct or gross negligence.

"In the case of an employer, principal, corporation, or other legal entity, punitive damages may be imposed for the conduct of an employee or agent only if the conduct of the employee or agent" constitutes intentional misconduct or gross negligence *and*

> (a) The employer, principal, corporation or other legal entity actively and knowingly participated in such conduct;
> (b) The officers, directors, or managers of the employers, principal, corporation, or other legal entity knowingly condoned, ratified, or consented to such conduct; or
> (c) The employer, principal, corporation, or other legal entity engaged in conduct that constituted gross negligence and that contributed to the loss, damages, or injury suffered by the claimant.

§ 768.72(3).

"Intentional misconduct" is defined as a "defendant ha[ving] actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursu[ing] that course of conduct, resulting in injury or damage." § 768.72(2)(a). "Gross negligence" is defined as conduct "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." § 768.72(2)(b).

As to the January 6 battery and false imprisonment claims, Ms. Bedy testified that she was told to take photographs of Maya before Maya could leave the hospital for the dependency court hearing. The Kowalskis presented evidence that a risk management analyst within the risk management department of JHACH directed the actions on January 6. Evidence established that it was JHACH's policy that the risk management department reports to senior counsel and then senior

32

counsel reports to the president of JHACH.[19] *Cf. Fla. Power & Light Co. v. Dominguez*, 295 So. 3d 1202, 1206 (Fla. 2d DCA 2019) (noting that a midlevel employee had a manager of his own to whom he reported); *Fetlar, LLC v. Suarez*, 230 So. 3d 97, 100 (Fla. 3d DCA 2017) ("[C]onstruction managers, superintendents, [and] construction workers . . . were not, on the record before us, officers or managing members of the limited liability companies . . . .").

There was no clear and convincing evidence that JHACH actively and knowingly participated in or engaged in intentional misconduct or gross negligence. *See Dominguez*, 295 So. 3d at 1205 ("[A] managing agent is an individual like a 'president [or] primary owner' who holds a 'position with the corporation which might result in his acts being deemed the acts of the corporation.' " (second alteration in original) (quoting *Taylor v. Gunter Trucking Co.*, 520 So. 2d 624, 625 (Fla. 1st DCA 1988))); *cf. Fed. Ins. v. Perlmutter*, 376 So. 3d 24, 38 (Fla. 4th DCA 2023) (plaintiff failed to present evidence establishing that defendant's employees held positions as corporate policymakers "which might result in conduct deemed to be" the defendant corporation's acts), *review granted*, No. SC2024-0058, 2024 WL 4948685 (Fla. Dec. 3, 2024); *Grove Isle Ass'n v. Lindzon*, 350 So. 3d 826, 831 (Fla. 3d DCA 2022) (identifying officer, director, or managing member as the requisite position in order for the action to have been taken by the corporation).

Likewise, there was no clear and convincing evidence that the actions in question in this case were relayed to senior counsel or to the CEO, much less that anyone ratified or condoned the actions other than

---

[19] There was also evidence that JHACH's risk management committee does not "function in real-time decisions" and meets only quarterly.

the risk management analyst. " '[B]efore one may infer that a principal ratified an unauthorized act of his agent, the evidence must demonstrate that the principal was [f]ully informed'—beyond having simple constructive knowledge—'and that he approved of the act.' " *Cleveland Clinic Fla. Health Sys. Nonprofit Corp. v. Oriolo*, 357 So. 3d 703, 707 (Fla. 4th DCA 2023) (second alteration in original) (quoting *Bach v. Fla. State Bd. of Dentistry*, 378 So. 2d 34, 36 (Fla. 1st DCA 1979)); *cf. Orlando Health, Inc. v. Mohan*, 387 So. 3d 477, 481 (Fla. 5th DCA 2024). And there was no evidence that a risk management analysist satisfies the statutory requirement of "officer, director, or manager of employees." Finally, to the extent that the Kowalskis argued ratification after the fact, "actions taken after the happening of a tortious act are not admissible on the issue of punitive damages, nor can those subsequent actions form the basis for bringing such a damage claim." *Oriolo*, 357 So. 3d at 707. In the absence of clear and convincing evidence, the issue of punitive damages should not have gone to the jury.

As to the October 18 through October 20 false imprisonment claim, there was no evidence that the physicians involved in moving Maya to the EEG room had actual knowledge of the wrongfulness of the conduct or that moving Maya into the room with video monitoring was reckless or wanting in care. Further, like the claims for the January 6 false imprisonment and battery, there was no evidence presented that JHACH participated in the actions or that the officers, directors, or managers of JHACH condoned or ratified the conduct. *Cf. McLane Foodservice Inc. v. Wool*, 400 So. 3d 757, 763 (Fla. 3d DCA 2024) ("[T]he admission that Wool has no idea if management (at any level) was ever notified of the calls and emails destroys any basis to ground a claim for punitive damages against McLane Foodservice. . . . Wool makes no allegation that

34

any managing agent of the employer was aware of customer complaints regarding the stacking of boxes at her restaurant location, let alone that they endorsed, approved, or willfully disregarded any unreasonable risk."); *Hosp. Specialists, P.A. v. Deen*, 373 So. 3d 1283, 1290 (Fla. 5th DCA 2023) (concluding that there was insufficient record evidence to establish that treating physician "knew that there was a high probability that additional injury or damage" would result to patient or that treating physician, as president of hospital, condoned or ratified actions taken).

The trial court erred in submitting the punitive damages claims to the jury.

## H.  Fraudulent billing

The trial court denied JHACH's motion for directed verdict on Mr. Kowalski's claim that JHACH fraudulently billed the Kowalskis' health insurance carrier by using a billing code for CRPS.  To survive directed verdict, Mr. Kowalski had to establish that JHACH made a false statement concerning a material fact in the bills to Mr. Kowalski and his insurance company, that JHACH knew the statement was false when it made it, that JHACH intended that Mr. Kowalski or his insurer would rely upon the false statement, and that Mr. Kowalski or his insurer was injured as a result of that reliance.  *See Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) ("[T]here are four elements of fraudulent misrepresentation: (1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in *reliance* on the representation." (quoting *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985))).  "Generally speaking, to satisfy the element of an injury, the claimant must establish that he or she has sustained pecuniary damage or injury by which he or

35

she has been placed in a worse position than he or she would have been absent the fraud." *Hoy*, 136 So. 3d at 651 (citing 37 C.J.S. *Fraud* § 68 (2013)).

JHACH contends that the trial court erred in denying its motion for directed verdict where Mr. Kowalski presented no evidence that JHACH made a false statement of material fact in billing Mr. Kowalski's insurance carrier under a code for CRPS and he presented no evidence of damages. We agree.

There is no dispute that Maya was admitted to JHACH having already been diagnosed with CRPS by another physician. The dispute concerns JHACH's billing of the Kowalskis' insurer where, according to Mr. Kowalski, the hospital did not believe that Maya had CRPS and did not treat Maya for CRPS. Evidence of JHACH's billing was introduced, as was evidence of payments by the insurer. However, Mr. Kowalski presented no evidence that JHACH's bills included false statements. That is, Mr. Kowalski presented no evidence that JHACH billed for services or treatments it did not perform or that it billed under a diagnosis that Maya did not have. JHACH's bills included as many as twelve diagnosis codes, and Mr. Kowalski was unable to testify what percentage of the insurer reimbursement was for CRPS versus the other codes, including nutrition, endoscopy, and child neglect/abandonment.

Further, Mr. Kowalski presented no evidence that he suffered pecuniary injury for the alleged fraudulent billing; he presented no evidence that he was billed for treatment, whether as deductible, copay, or balance payment, that was associated with a CRPS diagnosis. In fact, Mr. Kowalski concedes in this appeal that "[n]o damages in the form of increased co-pays, premiums or deductibles were proven at trial."

36

Moreover, in closing argument, counsel for Mr. Kowalski suggested that the jurors award $1 in nominal damages for this claim unless they found evidence of an increase in insurance costs or copays. Postverdict, Mr. Kowalski agreed to remit the jury award to $2 because Mr. Kowalski requested damages only for "deductibles or co-pays incurred" and "difficulty of finding insurance in the future" in the operative complaint and such damages were not proven. Where the claimant "is unable to prove that he or she was injured by the alleged misrepresentation, the trial court must grant a directed verdict on the claim." *Hoy*, 136 So. 3d at 651.[20]

The trial court erred in denying JHACH's motion for directed verdict on this claim.

I. New trial

The complexities in this case are only more complicated by the existence of immunity pursuant to section 39.203(1)(a). JHACH contends, as it did below, that the trial court's error in interpreting section 39.203 pervades not only the court's evidentiary rulings but the trial itself such that a new trial on all remaining counts is necessary.[21]

---

[20] Despite the concession that no pecuniary damages for fraudulent billing were proven at trial, counsel for the Kowalskis suggests that the trial court correctly denied the motion for directed verdict because "[t]he jury was entitled to consider Mr. Kowalski's loss of Mrs. Kowalski as billing fraud damages" and "Mr. Kowalski's loss of Mrs. Kowalski would have reasonably supported a verdict of five million dollars for billing fraud." No authority is cited for this argument, and we have found no basis in the law to support it.

[21] We do not address whether those claims survive on remand under a correct application of section 39.203(1)(a) immunity or otherwise. We would exceed our function were we to give an opinion on the merits of any of the claims for which a new trial is required; it is incumbent upon the parties to present the case anew and for the trial

37

As discussed herein, we agree. Moreover, "[t]he totality of all errors and improprieties, including those not discussed herein, was pervasive enough to raise doubts as to the overall fairness of the trial court proceedings." *Manhardt*, 832 So. 2d at 132.[22]

III.    Conclusion

The final judgment in favor of the Kowalskis is reversed. On remand, only the IIED claim brought on behalf of Maya and the remaining false imprisonment, battery, and medical negligence claims may be retried.

Reversed and remanded with instructions.

LaROSE, J., Concurs.
SMITH, J., Concurs specially.


SMITH, Judge, Specially concurring.

I concur in the majority opinion but write separately to elaborate on the discrete issue of whether JHACH was entitled to judgment as a matter of law on the threshold issue of "outrageousness" on Maya's claim for intentional infliction of emotional distress (IIED).

Maya, age ten, presented to the hospital with a pain score of ten out of ten. Ms. Bedy, a licensed clinical social worker employed by the

_____

court to rule on the evidence and issues arising therefrom and presented to it. *Cf. DiMare, Inc. v. Robertson*, 758 So. 2d 1193, 1194 (Fla. 3d DCA 2000) ("We decline to address events which may or may not occur at the retrial of this case."); *Marsh v. State*, 112 So. 2d 60, 63 (Fla. 1st DCA 1959) (Sturgis, C.J., concurring) ("The new trial, which our action envisions, should be neither prejudiced nor watered down by . . . obiter dicta . . . .").

[22] We need not address every argument raised by JHACH on appeal in order to reverse for a new trial, and nothing in this opinion should be construed as a determination on the merits of the unreached issues.

hospital, was in charge of overseeing and making sure that JHACH followed the dependency court orders, including the monitoring of hospital visits and phone conversations with Maya's friends and family, including her mother. Ms. Bedy spent considerable time with Maya, overseeing her care, including her physical therapy and taking Maya to the hospital chapel. She testified that Maya was in her wheelchair ninety-five percent of the time that she saw her. She also testified that Maya told her that "she was furious, angry, and in pain. She told Ms. Bedy she can't talk [to] or trust anyone." Ms. Bedy was privy to emails that highlighted the hospital's concerns that Maya was "self-mutilating." Maya maintained throughout her stay in the hospital that she was in debilitating pain and testified that she was worse off at the time of her discharge than when she presented to the hospital. Maya also complained that her CRPS lesions returned while she was in the hospital and were causing her pain. This is all to say that Maya was a patient, in pain, in a vulnerable state—not only because she was a patient dealing with debilitating pain, but also because of her tender age of ten.

From this evidence, a case was made by Maya that Ms. Bedy took advantage of Maya's circumstances and her vulnerable state; she lied to Maya that Maya's mother was getting mental health treatment, telling Maya that she may have to go into medical foster care and that Ms. Bedy could be her mother while she was in foster care. She further lied to Maya and used things that Maya enjoyed to encourage Maya to do better at physical therapy, but instead of rewarding her she would stomp and leave the room saying that Maya did not do well enough.

Maya also established at trial, through her own testimony, that the nurses spoke loud enough for Maya to overhear that they believed that her mom was causing her symptoms. Maya testified that the nurses

berated her and accused her of faking her ailments. She stated that a bedside toilet was placed far from her bed so that she could not reach it without walking—which she could not do. Maya would call for help to go to the bathroom, but no one would come in and take her, so she was forced to wet or soil herself in bed or otherwise fall and injure herself. Maya testified that the statements and actions of the nurses and Ms. Bedy were done to break her down and prove and/or force her to admit that she was faking her symptoms.

Maya pleaded, in her eighth amended complaint, an IIED claim, alleging these behaviors caused severe emotional distress and bodily harm. The complaint specifically referenced Maya's vulnerability as a minor while she was a patient at JHACH, alleging: "The Defendants' offenses are aggravated by the fact that Maya was a minor during the time of this outrageous conduct."

The tort of IIED was first recognized by the Florida Supreme Court in *Metropolitan Life Insurance v. McCarson*, 467 So. 2d 277, 278 (Fla. 1985). In *Metropolitan*, the court set out the four-part test as defined by section 46, Restatement (Second) of Torts (1965): (1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct; (3) the conduct caused the emotional distress; and (4) the distress was severe. This appeal concerns prong two as discussed in the initial brief and majority opinion, and so I only address this prong.

Florida courts have long recognized severe emotional distress claims by vulnerable individuals under section 46, Restatement (Second) of Torts (1965). Prior to *Metropolitan*, the Third District recognized that statements to a child of "tender years" can cause severe emotional distress under section 46. *See Korbin v. Berlin*, 177 So. 2d 551, 553 (Fla. 3d DCA 1965). In *Korbin,* the court reversed the dismissal of a severe

40

emotional distress claim brought under section 46 of the Restatement of the Law of Torts (1948 supplement) by a guardian on behalf of a six-year-old child against the defendant. *Id.* at 552-53. The defendant was alleged to have approached the child and said "Do you know that your mother took a man away from his wife? Do you know God is going to punish them? Do you know that a man is sleeping in your mother's room? . . . God will punish them." The question posed by the court was "whether what was said to the child was intended or reasonably calculated to cause the child 'severe emotional distress.' " *Id.* at 553. The court answered that question in the affirmative, holding:

> The alleged statements and the manner and circumstances under which they were communicated . . . to the child leave little room to doubt they were made with a purpose and intent to shame her, and to shock the sensibilities of this child of tender years. Relating, as they did, to the child's mother, the content and import of the statements were such that it cannot be said as a matter of law that this alleged deliberately harmful act was not one "calculated to cause 'severe emotional distress' to a person [child] of ordinary sensibilities."

*Id.* (alteration in original).

Following *Metropolitan*, the Fifth District, in *McAlpin v. Sokolay*, 596 So. 2d 1266 (Fla. 5th DCA 1992), recognized an IIED claim by a vulnerable patient against a health care provider. In *McAlpin*, the complaint alleged that the adult patient went to the hospital for an x-ray for her swallowing condition that caused speech difficulty and panic during attacks. *Id.* at 1267. Upon entering the x-ray area, the patient was verbally assaulted by a hospital physician who claimed that because the patient owed the physician's friend money, the patient would not pay the hospital bill; the physician threatened to have the patient removed from the hospital. *Id.* The complaint further alleged that the "actions of

41

[the physician] were designed and did take advantage of the vulnerability of [the patient], submitting as she was to diagnostic tests while in fear for her health and depending for comfort and solace upon the caring and supporting atmosphere to be generated by [the hospital]." *Id.* at 1268.

The trial court in *McAlpin* granted the physician's motion to dismiss with prejudice, finding that the physician's demand for the patient to pay the friend's bill, while "albeit not a favored method," was not sufficiently outrageous to rise to the level of an IIED claim. *Id.* at 1269. The Fifth District disagreed, holding that "the allegations of the complaint, if proved, support [the patient's] argument that a jury as the trier of fact could find that the [physician's] conduct was reckless and utterly outrageous in a civilized community. . . . [The physician] acted in deliberate disregard of the high degree of probability that emotional distress would follow." *Id.* at 1269 (citing Restatement (Second) of Torts § 46 comment I (1965)). In so holding, the district court reversed the dismissal of the IIED claim, recognizing the special relationship between a physician and a patient and that the actions of the physician met "the threshold test of extreme conduct which would cause an average member of the community to exclaim, 'Outrageous!' " *Id.* at 1270.

This court has indeed held that "[t]he extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." *Liberty Mutual Insurance v. Steadman,* 968 So. 2d 592, 595 (Fla. 2d DCA 2007) (quoting Restatement (Second) of Torts § 46 comment f). In *Steadman,* this court found instructive comment "f" to section 46 of the Restatement (Second) of Torts, "because it explains how knowledge of a person's particular susceptibility to emotional distress is relevant to determining whether

the conduct is sufficiently extreme and outrageous to constitute intentional infliction of emotional distress." *Id.*; *see also Anderson v. Prease*, 445 A.2d 612, 613 (D.C. 1982) (affirming judgment for plaintiff following a bench trial where physician cursed and screamed at patient, who was known by the physician to be susceptible to emotional distress). Comment "f" reads:

> The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know. It must be emphasized again, however, that major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough.

*Steadman,* 968 So. 2d at 595-96. The *Steadman* court viewed the facts of that case collectively and not in isolation, holding that the actions of the insurance company delaying the authorization of the insured's double lung transplant was outrageous where it was ordered by the Judge of Compensation Claims to pay the claim but delayed payment knowing that the insured would not outlive the delay, and it would not have to pay. *Id.* at 595.

We must acknowledge that the "unequal position of the parties in a relationship, where one asserts and has the power to affect the interests of the other, may also supply the heightened degree of outrageousness required for a claim of" IIED. *Id.* at 596. IIED claims exist where one is susceptible to emotional distress or due to the unequal positions of the parties and this was raised by the Kowalskis in the eighth amended complaint. Specifically, the complaint asserted that Maya, aged ten, was sheltered and placed in the care and custody of JHACH, that JHACH was

charged with "looking out for the best interests of Maya while in their care," and that Maya was isolated from her family, friends, schoolmates, and priest. I believe the allegations pleaded in the eighth amended complaint, and as more fully developed at trial, support Maya's theory of recovery for IIED under both comment "f" and "i" of section 46, Restatement (Second) of Torts. What is "odious and utterly intolerable in a civilized community" about the conduct here is that a licensed social worker in charge of the care of her patient should not lie and tell her patient, especially a patient of such a young age, that her mother, who has cared for her, is getting mental health treatment and will not be able to care for her in the near future, instead consoling the child that she will be fine in foster care where that social worker can be her mother. Further, the berating by the nurses that Maya was faking her symptoms is equally "odious and utterly intolerable in a civilized community," especially given Maya's physical condition and their knowing that Maya believed herself to be suffering from CRPS.

Just as the patient in *McAlpin* went to the physician for an x-ray for her medical problems and instead received verbal abuse, Maya too went to the hospital for debilitating pain and treatment, only to be broken down, mentally abused, and berated by Ms. Bedy and the hospital nurses who were in a position to facilitate her care and treatment. Based upon Maya's mental and physical condition, Ms. Bedy and the nurses acted in deliberate disregard of the high degree of probability that emotional distress would follow. The common thread amongst the cases upholding the "outrageousness" prong is the shockingness of the statement(s) given the unique circumstances in which those statements were made.

44

It is my opinion the trial judge will have to weigh whether or not some of the facts that fall within the chapter 39 immunity would be relevant and admissible on retrial as they relate to Maya's IIED claims. When considering a claim for IIED, the facts of that specific case must be considered. *See Thomas v. Hosp. Bd. of Directors of Lee Cnty.*, 41 So. 3d 246, 256 (Fla. 2d DCA 2010) (applying the facts of that specific case to reverse the dismissal of an IIED claim, holding "in a situation where a person's loved one has died, it would be apparent to anyone that the person would be susceptible to emotional distress and, therefore, that the action of providing false information concerning the loved one's cause of death meets the standard for" an IIED claim); *see also Williams v. City of Minneola*, 575 So. 2d 683, 691 (Fla. 5th DCA 1991) (noting that there are times where "behavior which in other circumstances might be merely insulting, frivolous, or careless becomes indecent, outrageous and intolerable").

While I agree that some of the actions taken by Ms. Bedy, the nurses, and others related to JHACH are entitled to immunity under chapter 39 and that the battery, false imprisonment, and medical malpractice claims cannot be used to meet the legal threshold for Maya's IIED claim, I also agree with the argument raised by Maya in her brief that "[c]hapter 39 did not authorize or protect [acts of intentional infliction of emotional distress]—especially when committed by healthcare provider, to whom <u>vulnerable</u> people look for care." (Emphasis added.) And I believe that some of the information related to Maya's shelter and the dependency court's orders would be relevant and admissible to the extent that information is required to give the jury a full picture of the circumstances at the time. It is hard to imagine a civilized community that accepts the actions of Ms. Bedy, a licensed

45

social worker, and the nurses as "good faith" participation in the requirements of chapter 39. To be sure, JHACH makes no attempt to cast such a broad net to include these actions as privileged under chapter 39, and, in fact, agreed at oral argument that the chapter 39 immunity was not absolute.

However, even after stripping Maya's IIED allegations of the offending claims and immunity-entitled evidence, there remains competent substantial evidence supporting the trial court's finding that Maya's IIED claim met the high bar of "outrageousness."[23]

These health care providers were in charge of caring for and treating Maya. Instead, they exploited their positions with full knowledge that Maya, a ten-year-old child, would not be able to endure such outrageous conduct and undoubtedly suffer severe emotional distress as a result.

The cases finding conduct outrageous are no different than the actions taken in Maya's case. In fact, Maya's case, given her vulnerable age paired with her special relationship as a patient under the care of Ms. Bedy and the nurses, is a more compelling one "which would cause an average member of the community to exclaim, 'Outrageous!' " *See McAlpin*, 596 So. 2d at 1270.

---

[23] JHACH counters some of this evidence, but weighing that evidence against Maya's evidence is a jury question not to be resolved on a directed verdict motion or, for that matter, in determining whether the alleged actions and statements met the threshold inquiry. *Moisan v. Frank K. Kriz, Jr., M.D., P.A.*, 531 So. 2d 398, 399 (Fla. 2d DCA 1988) ("In ruling on [a motion for directed verdict], the trial court may not weigh the evidence or assess a witness's credibility and must deny the motion if the evidence is conflicting or if different conclusions and inferences can be drawn from it.").

46

For these reasons, I agree that Maya's IIED claim should be retried with the remainder of the counts.

_____

Opinion subject to revision prior to official publication.